IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 20-cv-2352-WJM-SKC

BOX ELDER KIDS, LLC,
C C OPEN A, LLC, and
GUEST FAMILY TRUST, by its Trustee CONSTANCE F. GUEST, individually and on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

ANADARKO E & P ONSHORE, LLC,
ANADARKO LAND CORPORATION, and
KERR-MCGEE OIL AND GAS ONSHORE, LP,

    Defendants.

---

**ORDER DENYING DEFENDANTS' F.R.C.P. 56 MOTION FOR SUMMARY JUDGMENT ON THE NAMED PLAINTIFFS' ALLOCATION CLAIM**

---

Plaintiffs Box Elder Kids, LLC ("Box Elder"), C C Guest A, LLC ("CC Open A"), and the Guest Family Trust, by its Trustee Constance F. Guest, individually and on behalf of themselves and all others similarly situated (collectively, "Plaintiffs") bring this breach of contract lawsuit against Anadarko E & P Onshore, LLC, Anadarko Land Corporation, and Kerr-McGee Oil and Gas Onshore, LP (collectively, "Anadarko" or "Defendants"), alleging that Anadarko failed to pay them the correct monetary amount pursuant to the terms of their surface owner agreements ("SOAs") with Anadarko.  (ECF No. 25.)

Before the Court is Defendants' F.R.C.P. 56 Motion for Summary Judgment on the Named Plaintiffs' Allocation Claim.  (ECF No. 62.)  For the reasons set forth below,

the Motion is denied.

## I. BACKGROUND[1]

Plaintiffs own surface land in Weld County, Colorado.  (ECF No. 62 at 4 ¶ 1.)  Box Elder and CC Open A own the surface lands on contiguous pieces of property in Section 25 of Township 2 North, Range 65 West.  (*Id.* at 5 ¶ 7.)  Guest Family Trust owns the surface lands in the southwest quarter of Section 13, Township 2 North, Range 65 West, one mile north of Box Elder's and CC Open A's lands.  (*Id.* ¶ 8.)

Anadarko Land owns the interests in the mineral estate under Plaintiffs' lands; however, it does not itself develop or operate oil and gas wells.  (*Id.* at 4 ¶¶ 2–3; ECF No. 72 at 4 ¶ 2.)  Instead, it leases the right to explore for and develop the mineral estate beneath Plaintiffs' lands to operators, including its affiliate Kerr-McGee Oil & Gas Onshore LP ("KMOG"), an entity that drills and operates oil and gas wells.  (ECF No. 62 at 5 ¶¶ 4–5.)  KMOG operates all of the oil and gas wells at issue on Plaintiffs' lands.  (*Id.* ¶ 6.)  There are 46 wells drilled on Plaintiffs' lands, which produce oil and gas from inside as well as outside the boundaries of Plaintiffs' surface lands.  (*Id.* ¶¶ 9–10.)

### A.     Relevant Agreements

The minerals under Box Elder's surface lands are subject to an oil and gas lease entered into between Union Pacific Resources Company as lessor and United States Exploration, Inc. as lessee on May 15, 1998, and recorded at Reception No. 2614700 in the Weld County Clerk and Recorder's Office.  (*Id.* ¶ 11.)  The minerals under CC Open A's and Guest Family Trust's surface lands are subject to an oil and gas lease entered

---

[1] The following factual summary is based on the parties' briefs and documents submitted in support thereof.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

into between Union Pacific Railroad Company as lessor and Pan American Petroleum Corporation as lessee on January 8, 1971 and recorded at Reception No. 1561890 in the Weld County Clerk and Recorder's Office.  (*Id.* ¶ 12.)  All of the wells that produce or produced oil and gas from Plaintiffs' lands are subject to one of the two leases set forth above.  (*Id.* ¶ 14.)  Defendants contend that Anadarko Land is the successor-in-interest lessor and KMOG is the successor-in-interest lessee of the two leases.  (*Id.* ¶ 13.)

Box Elder's and CC Open A's predecessor-in-tile to their respective surface lands, Zelda H. Shaklee, entered into a SOA (the "Shaklee SOA") on November 3, 1989, with Anadarko Land's predecessor-in-title to the minerals, Union Pacific Resources.  (*Id.* ¶ 15.)  The Shaklee SOA is recorded at Reception No. 2198107 in the Weld County Clerk and Recorder's Office.  (*Id.*)

Guest Family Trust's predecessors-in-title to the surface lands, Raymond R. Guest and Constance F. Guest, entered into a SOA (the "Guest SOA") on June 20, 1973, with Champlin Petroleum Company (now Anadarko E&P).  (*Id.* ¶ 16; ECF No. 72 at 7 ¶ 16.)  The Guest SOA is recorded at Reception No. 1622005 in the Weld County Clerk and Recorder's Office.  (ECF No. 62 at 7 ¶ 16.)

Section 2 of the Shaklee SOA contains the following payment provision, which gives the surface owner a contractual right to cash payments based on the value of oil and gas produced from or allocated to the lands covered by the SOAs:

> [Anadarko] agrees, so long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises or allocated thereto under the provisions of a unitization agreement, to pay or cause to be paid to the Landowner in cash the value (which shall never be greater than the amount realized by [Anadarko] from the sale of such production) on the premises of two and one-half percent (2-1/2%) of all the oil and gas and associated liquid

3

> hydrocarbons hereafter produced, saved, and marketed therefrom or allocated thereto as aforesaid, . . .

(*Id.* ¶¶ 17, 19.)  The Guest SOA contains a nearly identical payment provision, except that it omits the explanatory parenthetical.  (*Id.*)

The SOAs define the term "unitization agreement" as follows:

> [A]ny operating agreement, or any other agreement covering the exploration or development for or the production of oil, gas or associated liquid hydrocarbons, or any pooling, communitization, unit or other agreement whereby the described premises may be included with other lands in proximity thereto as a unit area under a plan of unit or joint exploration, development and operation.

(*Id.* ¶ 18.)

Plaintiffs also entered into Surface Use Agreements and Surface Damage Agreements to compensate them "for any and all normal and customary detriment, depreciation, injury or damage to the Lands or crops growing thereon that may occur as a result of [KMOG's] drilling and completion operations on the Lands."  (*Id.* ¶ 20.)

**B.     Modification of the SOA Payments**

Until 2010, Anadarko paid surface owners whose lands were subject to an SOA 2½% of the value of all the oil and gas produced from a well located on their lands, including oil and gas allocated to other lands.  (*Id.* ¶ 22.)  Defendants contend that as a result, "surface owners without wellheads on their surface lands were not paid on oil and gas produced from and allocated to the minerals underneath their lands produced by a wellhead off their surface lands."  (*Id.*)

Thereafter, Anadarko sent Plaintiffs letters, which stated the following:

> The [SOA] payments have generally been made to the owner of surface upon which a well has been located without consideration to language contained in the [SOA] providing

4

> that, under certain circumstances, such payments should be allocated among various surface owners.  While in the past this practice may not have resulted in a discrepancy between the recipient(s) of the [SOA] payments despite the applicability of the allocation language, a number of recent developments in the Wattenberg Field have given rise to a different result.  Two examples of these recent developments are the increased in-fill drilling and use of directional and horizontal drilling by industry.  Other factors which have highlighted the need to consider the allocation language in the [SOA] include the increased surface development in the area, the failure of surface owners to notify Anadarko of sales and transfers of surface interests, the limited production information Anadarko receives from certain of its lessees, and recent regulatory and statutory changes impacting the development of oil and gas resources in the Wattenberg Field.
>
> The numerous unforeseen changes in the legal, business and surface use environments, dictate that Anadarko adjust the calculation of the [SOA] payments to give effect to the language providing for allocation of such payments among certain surface owners.  Accordingly, Anadarko has been in the process of reviewing its records to determine how all of the surface owners in the Wattenberg field are being paid under the [SOA]. The [SOA] payments will be adjusted and paid in the proportion that a surface owner's acreage which is (i) covered by a [SOA] and (ii) located within the boundaries of a drilling and spacing unit (as established for each well by the Colorado Oil and Gas Conservation Commission rules and regulations), bears to the total acreage located within the boundaries of such drilling and spacing unit.  Anadarko's review of its records and subsequent adjustments to payments may result in a change in how your [SOA] is paid.  Your [SOA] payment may be adjusted upward or downward depending on the circumstances.  Currently, Anadarko has no plan to make any adjustments or to recoup for [SOA] payments previously paid to you.

(*Id.* ¶¶ 24–25; ECF Nos. 62-9, 62-10.)

Defendants contend that after 2010: (1) KMOG paid Plaintiffs for the oil and gas allocated to the Plaintiffs' lands for each of the 46 wells in direct proportion to each

5

Plaintiff's share of the surface relative to the total area of the applicable spacing or pooling agreement; and (2) Anadarko paid each Plaintiff on the value of oil and gas produced from wells located off Plaintiffs' lands that are allocated to the Plaintiffs' land under a unitization agreement. (ECF No. 62 at 11 ¶¶ 26–27.) Plaintiffs deny that Anadarko paid them the correct value of oil and gas produced from wells located off the Plaintiffs' lands that are allocated to Plaintiffs' land under a unitization agreement. (ECF No. 72 at 12 ¶ 27.)

**C.     Procedural History**

Plaintiffs initiated this lawsuit on August 7, 2020 and filed the First Amended Class Action Complaint and Demand for Jury Trial on October 5, 2020, which includes a single count for breach of contract based on underpayments based on Defendants' proportional allocation interpretation of the SOAs, as well as Defendants' purported unlawful deduction of certain costs, unlawful embedding deduction, and reduction volumes on check details. (ECF Nos. 1, 25.)

Defendants filed the Motion on July 29, 2021. (ECF No. 62.) Plaintiffs responded on August 19, 2021 (ECF No. 72), and Defendants replied on September 2, 2021 (ECF No. 74). This action was reassigned to the undersigned on August 9, 2021. (ECF No. 68.)

## II. LEGAL STANDARDS

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### III. ANALYSIS[1]

In a contract case, a motion for summary judgment allows for contract interpretation as a matter of law. *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n of State of Colo.*, 67 P.3d 12, 20 (Colo. 2003) (en banc). However, before a moving party can attack a contract claim on summary judgment, the moving party must first show that the contract is unambiguous and can be construed as a matter of law. *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1055 (D. Colo. 2013).

"In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally

---

[1] In the Motion, Defendants clarify that they seek "summary judgment on the allocation claim only as it applies to the three named Plaintiffs" and that the Motion "does not address and does not seek summary judgment on Plaintiffs' claim that Defendants improperly deducted certain costs from SOA payments." The Court limits its analysis and ruling accordingly. (ECF No. 62 at 2 n.1.)

7

accepted meaning of the words used, and reference must be made to all the agreement's provisions." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) (en banc). Mere disagreement of the parties does not necessarily indicate the documents are ambiguous. *Id.* Rather, a contract is ambiguous if it is "fairly susceptible to more than one interpretation." *Id.* If a contract is not ambiguous, extrinsic evidence is not admissible to prove the parties' intent, and the parties' intent must be determined from the terms of the contract. *Id.*

However, where a contract is ambiguous, "the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues." *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005) (en banc). Courts must then give effect to the intention of the parties by considering "competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance." *Id.* Thus, when a court determines that a document is ambiguous, it may then consider parol evidence to explain or clarify the meaning of a document or the effect of its provisions. *Id.*

For purposes of the Motion, the parties' breach of contract dispute relates to the proper interpretation of Section 2 of the SOAs, which provides:

> [Anadarko] agrees, so long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises or allocated thereto under the provisions of a unitization agreement, to pay or cause to be paid to the Landowner in cash the value (which shall never be greater than the amount realized by [Anadarko] from the sale of such production) on the premises of two and one-half percent (2-1/2%) of all the oil and gas and associated liquid hydrocarbons hereafter produced, saved, and marketed therefrom or allocated thereto as aforesaid, . . .

(ECF No. 62 at 7 ¶ 17.)

Defendants argue that because "the production from each of the 46 wells is allocated amongst mineral owners based on each owner's fractional share of surface ownership in the unit" pursuant to unitization agreements, the Court should grant summary judgment in their favor. (ECF No. 62 at 13.) According to Defendants,

> [p]ayments are to be made based on "production from the described premises or allocated thereto under the provisions of a unitization agreement." . . . The second phrase ("to pay or cause to pe [*sic*] paid . . .") identifies how the SOA payment is calculated. If there is a unitization agreement for the well, Anadarko pays the SOA holder a percentage of the value of the oil and gas "allocated thereto as aforesaid." The "allocated thereto aforesaid" language refers to the prior phrase "allocated thereto under the provisions of a unitization agreement." Accordingly, based on the plain language of Section 2, Anadarko is required to pay 2½% of the oil and gas "allocated" to the "described premises" in the SOA when oil and gas is produced under the provisions of a "unitization agreement."

(ECF No. 62 at 16–17.) Defendants further contend that "[b]ecause all oil and gas production attributable to the 46 wells on the Plaintiffs' lands are subject to unitization agreements, Plaintiffs are not entitled to any percentage of the value of the oil and gas allocated to other lands" and that "[t]he SOA payment provision does not vary the payment methodology based on the physical location of a wellhead." (*Id.* at 17–18.)

By contrast, Plaintiffs argue that Defendants' current payment practices violate the SOAs because each "SOA, on its face and by its terms, requires payment to Plaintiffs of 2.5% on 100% of the production from wells on their land (*i.e.*, the way Defendants and their predecessors paid them for +/- 80 years)." (ECF No. 72 at 15–16.) Plaintiffs argue that "the calculation of the production payment is different for SOA lands on which there are wells and facilities from which oil and gas is 'produced, saved

9

and marketed' and SOA lands that have no surface disturbance, but minerals are being drained." (*Id.* at 18–19.)  Under Plaintiffs' reading of Section 2,

> the former (*i.e.*, lands on which there are wells and facilities from which oil and gas is "produced, saved and marketed") is entitled to the full 2.5% and the latter (SOA land with no surface disturbance but from which minerals are being drained) is entitled to a portion of 2.5% that is "allocated to" the land according to the portion of the oil and gas drained from under its land.  The use of the disjunctive word "or" in paragraph two clearly separates these two situations.

(*Id.* at 19.)  Plaintiffs further contend that to the extent the contract language is fairly susceptible to more than one interpretation, it is ambiguous and must be construed by the trier-of-fact in connection with the history of the interpretation of the contract provision.  (*Id.* at 16.)

After carefully considering the plain language of the SOAs and the parties' respective arguments, the Court concludes that Section 2 is ambiguous on its face.  While the Court recognizes that all of Plaintiffs' 46 wells are subject to a unitization agreement, the undersigned cannot conclude that the plain language of the SOAs provide that Plaintiffs are not entitled to *any* percentage of the value of the oil and gas allocated to other lands.  On the other hand, the Court also cannot conclude that the plain language of the SOAs clearly sets forth the two different payment scenarios articulated by Plaintiffs.

Because Section 2 of the SOA is "fairly susceptible to more than one interpretation," *Fibreglas Fabricators, Inc.*, 799 P.2d at 374, the Court concludes that the contract language is ambiguous, and must therefore be interpreted by the trier of fact after considering "competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance," *E.*

10

*Ridge of Fort Collins, LLC*, 109 P.3d at 974.

Accordingly, the Motion is denied.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that Defendants' F.R.C.P. 56 Motion for Summary Judgment on the Named Plaintiffs' Allocation Claim (ECF No. 62) is DENIED.

Dated this 21st day of March, 2022.

BY THE COURT:

_____
William J. Martínez
United States District Judge