IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 20-cv-2352-WJM-SKC

BOX ELDER KIDS, LLC,
C C OPEN A, LLC, and
GUEST FAMILY TRUST, by its Trustee CONSTANCE F. GUEST, individually and on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

ANADARKO E & P ONSHORE, LLC,
ANADARKO LAND CORPORATION, and
KERR-MCGEE OIL AND GAS ONSHORE, LP,

    Defendants.

## ORDER DENYING CLASS CERTIFICATION

Plaintiffs Box Elder Kids, LLC ("Box Elder"), C C Guest A, LLC ("CC Open A"), and the Guest Family Trust, by its Trustee Constance F. Guest, individually and on behalf of themselves and all others similarly situated (collectively, "Plaintiffs") bring this breach of contract lawsuit against Anadarko E & P Onshore, LLC, Anadarko Land Corporation, and Kerr-McGee Oil and Gas Onshore, LP (collectively, "Anadarko" or "Defendants"), alleging that Anadarko failed to pay them the correct monetary amount pursuant to the terms of their surface owner agreements ("SOAs") with Anadarko. (ECF No. 25.)

Before the Court is Plaintiffs' Corrected Motion for Class Certification and Brief in Support ("Motion to Certify") (ECF No. 104). Also before the Court is the parties' Joint Motion for Oral Argument Regarding Class Certification ("Joint Motion"). (ECF No.

125.) The Motion to Certify has been extensively briefed. (*See* ECF Nos. 105, 106, 116, 121, 122, 132.) For the reasons set forth below, the Motion to Certify is denied, and the Joint Motion is denied as moot.

## I. BACKGROUND[1]

The Court assumes the parties' familiarity with the facts of this case and limits the background discussion below to those facts necessary to rule on the Motion to Certify.

Plaintiffs seek to represent a class of surface landowners whose land is within the defined premises of SOAs on which there are wells that produce from beyond the SOAs' defined premises. (*See* ECF No. 116 at 15.) The area from which a well produces is known as a "spacing unit" and is defined by state regulators when a well is approved. (ECF No. 127-1 at 7.) Well placement and spacing units do not necessarily follow property lines, and the spacing units for wells often contain land within multiple, individually owned parcels. (*See, e.g.*, ECF No. 105-18 at 2.) Sometimes, they even contain land covered by multiple SOAs. (*See* ECF No. 121 at 5–6.)

Prior to 2010, Defendants paid 2.5% of the cash value of a well's production to the owner of the land on which the wellhead sat. (ECF No. 104 at 11.) Since 2010, Defendants have allocated payments based on what percentage of a well's spacing unit was within a landowner's parcel, regardless of where the wellhead is located. (*Id.* at 11–12.) This change in methodology resulted in some SOA landowners receiving larger payments, while others' payments were reduced. (*See* ECF No. 105-16 at 3.)

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

2

## II. LEGAL STANDARDS

As the party seeking class certification, Plaintiffs must first demonstrate that all four prerequisites of Federal Rule of Civil Procedure 23(a) are clearly met. *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir. 2004); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013). These threshold elements are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Though not enumerated in the rule, courts have widely held that the party seeking class certification must also prove that the absent members of the class are ascertainable. *Rivera v. Exeter Finance Corp.*, 2019 WL 6176069, *3 (D. Colo. Mar. 31, 2019).

If Plaintiffs prove they have met these threshold requirements, they must then demonstrate that the action falls within one of the three categories set forth in Rule 23(b). *Shook*, 386 F.3d at 971. Here, Plaintiff seeks certification pursuant to Rule 23(b)(3), which permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior." Fed. R. Civ. P. 23(b)(3).

The party seeking to certify a class bears the strict burden of proving the requirements of Rule 23. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006). In determining the propriety of a class action, the question is not whether a plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Anderson v. City of Albuquerque*, 690 F.2d 796, 799

(10th Cir. 1982). While the Court should not pass judgment on the merits of the case, it must conduct a "rigorous analysis" to ensure that the requirements of Rule 23 are met. *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

The decision whether to grant or deny class certification "involves intensely practical considerations and therefore belongs within the discretion of the trial court." *Tabor*, 703 F.3d. at 1227.

### III. PROPOSED CLASS

Plaintiffs seek certification of the following class:

> All owners of the surface of the land within the UP Strip (Colorado, Wyoming, and Utah) who are receiving production payments under an unexpired Surface Owner Agreement (the "SOA") covering mineral interests once owned by Union Pacific Railroad Company to which Defendants Anadarko Land Corporation, Anadarko E & P Onshore, LLC, or Kerr-McGee Oil and Gas Onshore, LP have succeeded and on which one or more wellheads are located that produce oil and gas from the subsurface beyond the boundaries of the "Described Premises" covered by the SOA.
>
> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); (2) Defendant, its affiliates, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) primarily engaged in oil and gas exploration, gathering, processing, or marketing; (4) any and all SOA holders that have no wellheads on their land, or who have only wellheads on their land that produce only from their land and not from beyond the boundaries of their land; and (5) any and all SOA holders whose payments are properly subject to both proportionate reduction and the deduction of all post-production costs.

(ECF No. 116 at 15.)

### IV. ANALYSIS

**A.    Rule 23(a) Factors**

    1.    <u>Numerosity</u>

4

There is no bright line number at which the members of a class become "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Some courts have held that there are certain thresholds at which numerosity can be presumed.  *See Stewart v. Abraham*, 275 F.3d 220, 226–227 (3d Cir. 2001) (presuming numerosity at 40 members); *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (same).  Plaintiffs reference this presumption, and while they acknowledge that "no specific number" exists at which the numerosity requirement is satisfied, they assert that "generally fewer than 20 members is too few and more than 40 suffices." (ECF No. 104 at 18).  Plaintiffs cite a well-respected treatise for this proposition (*Id.* at 18 n.66); however, the Tenth Circuit has specifically refused to adopt such a presumption.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).  Instead, the Tenth Circuit has instructed district courts to conduct a "fact-specific inquiry" into the "factors that enter into the impracticability issue."  *Colo. Cross Disability Coalition v. Abercombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014).

Plaintiffs have identified "approximately 210" SOAs with wellheads that produce from beyond their defined premises and are not otherwise excluded.  (ECF No. 104 at 12.)  There is at least one (and often more than one) surface landowner subject to each of these SOAs, and therefore Plaintiffs assert numerosity is met.  (*Id.*)  Defendants seemingly concede numerosity is met, making no reference to it in their response other than to quote Rule 23(a).  (*See* ECF No. 105 at 11.)  Regardless, it remains Plaintiffs' "strict burden" to prove numerosity is clearly met.  *Trevizo*, 455 F.3d at 1161.

After considering the specific facts of this case, the Court finds the numerosity requirement has been met.  The parties agree that many of the 210 SOAs identified by

Plaintiffs have been subdivided into smaller parcels—at least one such SOA has as many as 64 individual surface landowners.  (ECF No. 105 at 7; ECF No. 116 at 6.)  As such, there are potentially thousands of class members.

Defendants argue that this is not a case where "small recoveries do not provide the incentive for any individual to bring a solo action" because Plaintiffs' individual claims range from approximately $700,000 to $2.6 million.  (ECF No. 105 at 19–20; ECF No. 104-16 at 16); *see Abercombie & Fitch Co.*, 765 F.3d at 1215 (indicating that "the size of the individual claims" is among the factors district courts should consider).  The record shows that Plaintiffs' own large tracts of land—Guest Family Trust owns the entire defined premises in the Guest SOA, and Box Elder (160 acres) and CC Open A (400 acres) split the 560-acre defined premises of the Shaklee SOA between themselves.  (ECF No. 116-5 at 4).  In contrast, among the specific examples Defendants' expert Eric Krause discusses in his supplemental report are absent class members subject to SOAs covering substantially less acreage (ECF No. 122-2 at 4) or whose parcels are much smaller than Plaintiffs' (*id.* at 3).  Consequently, these absent class members have much smaller claims that do not justify expensive litigation.

Therefore, the Court finds that joinder of all class members would be impractical.

2. <u>Commonality</u>

"To satisfy the commonality requirement, a party seeking class certification must demonstrate 'there are questions of law or fact common to the class.'" *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (quoting Fed. R. Civ. P. 23(a)(2)).  "In other words, the class members' claims must 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that

6

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 388, 350 (2011)).

"[T]he Supreme Court has instructed that a question is common if there is "some glue holding the class members' allegations together." *Menocal*, 882 F.3d at 914 (quoting *Dukes*, 564 U.S. at 352). "A finding of commonality requires only a single question of law or fact common to the entire class." *Id.*

Plaintiffs argue there are four common questions: (1) "Are deductions for post-production costs, other than the cost of manufacturing gas products, authorized?"; (2) "Are payments to Class Members on Class Wells subject to proportionate reduction under the SOA language?"; (3) "Did Defendants deduct post-production costs from payment to SOA holders that were not authorized under the SOA?"; and (4) "Did Defendants proportionally reduce the payment due Class Members in violation of the SOA?" (ECF No. 104 at 21–22.) Plaintiffs assert these questions are capable of being answered with classwide proof and, no matter how they are answered, will drive all class members' claims toward resolution on the merits. (*Id.* at 8–9.)

The Court agrees. The first two questions are legal questions that can be resolved by resort to the language of the SOAs, relevant law, and evidence of prior payment practices and the long-term course of conduct of the parties. (*Id.* at 22.) The third and fourth questions are factual questions that can be answered by reviewing payment documents and via expert testimony. (*Id.* at 22–23.) With all of these questions, if Plaintiffs prevail, so do absent class members; and if Plaintiffs fail, so do absent class members. Therefore, the Court finds there are questions of law and fact

common to the putative class.

      3.     Typicality

Plaintiffs assert their claims are typical of the class because they "plead the same legal theory" and "allege the same factual basis for recovery against Defendants. (ECF No. 104 at 13.) Defendants do not address typicality in their briefing opposing certification. (*See* ECF No. 105.) "The positions of the class representatives need not be identical to those of the other class members, so long as there is a sufficient nexus between the claims of the class representatives and the common questions of law or fact which unite the class." *Decoteau v. Raemisch*, 304 F.R.D. 683, 689 (D. Colo. 2014). "The relevant inquiry is 'whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Torres-Vallejo v. Creativexteriors, Inc.*, 220 F. Supp. 1074, 1083 (D. Colo. 2016) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Having considered these principles, the Court finds the Plaintiffs' individual claims are sufficiently interrelated with the claims they assert on behalf of the putative class they seek to represent. Plaintiffs assert they were not paid the full amount they are due under the payment provisions of the SOAs, that members of the putative class were also underpaid, and that these underpayments were for the same reasons (improper expense deductions and proportional reductions based on a flawed application of the "allocated to" payment method). (*See* ECF No. 104 at 8–9.) Therefore, the Court finds that the Plaintiffs' claims are typical of the class.

    4.     <u>Adequacy</u>

The core of the adequacy inquiry is whether the named plaintiffs "have any conflicts of interest with other class members" and will "prosecute the action vigorously on behalf of the class."[1]  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).  In addition, "[c]ourts have found that intra-class conflicts 'may negate adequacy under Rule 23(a)(4).'"  *Daye v. Comty. Fin. Serv. Ctrs., LLC*, 313 F.R.D. 147, 164 (D.N.M. 2016) (collecting cases).  Not just any conflict will defeat a party's claim of adequacy—"only a conflict that goes to the very subject matter of the litigation" will do so.  *Id.*; *see also* 7A Wright, Miller & Kane, Federal Practice & Procedure § 1768 (4th ed. 2022).  Whether such an intraclass conflict exists is one of Defendants' leading arguments contesting class certification.  (ECF No. 105 at 12–19.)

In the Motion to Certify, Plaintiffs assert they can "fairly and adequately protect the interest of the class" because they "have participated actively and know their responsibility to do what is best for the Class as a whole."  (ECF No. 104 at 19–20.)  Further, they contend they're "in no apparent conflict of interest between [them and] the potential Class Members."  (*Id.* at 19.)

Defendants argue Plaintiffs' framing "glosses over" an intractable intraclass conflict with the "conclusory statement" that no apparent conflict exists.  (ECF No. 105 at 13.)  Defendants argue Plaintiffs' legal theory, if successful in this litigation, would benefit some class members at the expense of others.  (*Id.*)  Defendants argue that reversion to the pre-2010 practice of paying the full 2.5% due under the SOAs to the

---

[1] Historically, this inquiry also encompassed counsel's potential conflicts of interest and ability to vigorously prosecute the action; however, in 2003, the Federal Rules of Civil Procedure were amended to add Rule 23(g), under which those questions are now generally addressed.  *See Lyall v. City & Cnty. of Denver*, 319 F.R.D.558, 564–65 (D. Colo. 2017).

9

landowner on whose land the wellhead is located would result in larger payments for putative class members with the most productive wells, and smaller payments for those with less productive wells—even when those class members are subject to the same SOA.  (*Id.* at 13–14.)  Defendants' expert, Eric Krause, identified specific putative class members whose interests they assert are adverse to Plaintiffs' interests.  (*Id.*)

One example involves a putative class member whose small parcel contains a "directional well with marginal production" that produces from beyond the confines of his land.  (*Id.* 14.)  His parcel is bordered by two separate parcels subject to the same SOA but owned by other individuals.  (*Id.*)  On those other individuals' parcels are two "prolific" wells from which the putative class member receives substantially larger payments.  (*Id.*)  If Plaintiffs prevail in this litigation and this putative class member is bound to the resulting judgment, his overall payments will go down.  (*See id.* at 15.)

Another such example Krause identified is a putative class member who receives substantial payments for wells with wellheads located outside the relevant SOA but with spacing units that include his land.  (*Id.*)  These wellheads are located on land not subject to any SOA and, under the pre-2010 payment system, Defendants "would have made no SOA payments whatsoever on these wells."  (*Id.*)  Defendants argue that Plaintiffs' legal theory would harm this putative class member because he would no longer receive payment for oil produced from his land by wellheads subject to no SOA. (*Id.*)

Defendants argue these two examples demonstrate how determining whether a putative class member is a winner or loser under Plaintiffs' theory is a fact-intensive inquiry and certifying a class would "force SOA owners into a blind choice that would

10

raise serious due-process concerns." (*Id.* at 16 (citing *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812) (1985).)  Further complicating the matter is that well production is not static: wells that are productive today or in the past may become marginal wells in the future; and parcels that have no wellheads or wellheads for only marginal wells may become the sites for future prolific wells.  (*Id.* at 16–17.)  In essence, Defendants argue, absent members of the putative class would have to roll the dice when choosing whether to opt out of the class, not knowing whether they are winners or losers today or will be winners or losers in the future.  (*Id.*)

In Defendants' view, Plaintiffs cannot avoid the conflict within the class they have constructed by advocating an "absurd" construction of the SOAs that requires Defendants to pay the full 2.5% to the owners of the surface land on which the wellheads are located *and* allocated payments to other landowners whose land forms part of the spacing unit from which those same wells produce.  (*Id.* at 19.)

In their reply, Plaintiffs argue the contrived intraclass conflict Defendants assert is based on a misunderstanding (or misrepresentation) of Plaintiffs' legal theory.  (ECF No. 116 at 9.)  Plaintiffs assert their legal theory *is not* that the pre-2010 payment method is required by the SOAs, and they do not challenge the allocation of production proceeds among landowners based on how much of the surface area they own.  (*Id.* at 9–10.)  Instead, Plaintiffs explain that if they were to prevail, Defendants would be required to pay the full 2.5% for every well with a wellhead located within the SOA to the owners of the surface land within the defined premises of that SOA, allocated by the percent of the total defined premises each landowner owns.  (*Id.* at 10.)  Plaintiffs contend there is no conflict under this theory because all putative class members would

11

benefit from increased payments proportionate to their landownership within their respective SOAs. (*Id.*) As for the practice of paying landowners a proportionately reduced payment for production from wells with wellheads located outside their SOA defined premises but with a spacing unit that encompasses SOA lands, "Plaintiffs don't challenge this practice." (*Id.* at 11.)

In their surreply, Defendants argue the theory put forth in Plaintiffs' reply is not supported by the SOAs' language and fails, despite Plaintiffs' best efforts, to align the interests of the putative class members. (ECF No. 121 at 5.) Defendants again rely on Krause, who identifies absent members of the putative class who would lose money under the theory of payment allocation Plaintiffs argue in their reply. (*Id.* at 5–6.) Specifically, Krause identifies an absent member of the putative class who, under the current payment method, derives most of its SOA payments from wells with spacing units that encompass its land and wellheads on the defined premises of a *different* SOA. (ECF No. 122-2 at 4.) Defendants argue such putative class members would be worse off under Plaintiffs' theory because the larger payments they receive from productive wells with wellheads on another SOA would be divided among the landowners of the SOA on which the wellheads are located, and replaced with payments from less productive wells that are larger as a percentage of production but result in overall lower payments. (ECF No. 121 at 5.) Therefore, Defendants insist that no matter which of Plaintiffs' theories the Court considers, there will always be members of the putative class who are winners under the current payment methodology and stand to lose under a different methodology.

Plaintiffs', in their sur-surreply, assert that any conflict between class members is

12

created by Defendants, not Plaintiffs' legal theories or class definition.  (ECF No. 132 at 1–2.)  In Plaintiffs' view, Defendants "wrongly assert[] that as a consequence of losing this case, [they] will stop making payments under the 'drilled under' agreements to non-class members."[2]  (*Id.* at 2.)  This is because "'drilled under' payments are not at issue in this lawsuit" and will "only cease if [Defendants] decide[] to stop making them in retaliation for this lawsuit."  (*Id.*)

Defendants take issue with Plaintiff's "clarifying" the class definition in their reply brief.  (ECF No. 116 at 14–15; ECF No. 121 at 2.)  They argue "Plaintiffs exhibit a cavalier willingness to fundamentally alter the *substantive* claim they purport to bring on behalf of others in an attempt to meet the *procedural* requisites to represent those absent class members in the first place."  (ECF No. 121 at 2.) (emphasis in original).  Plaintiffs argue "[a]djustments to a legal theory in response to discovery obtained and arguments made are a natural result of the litigation progressing, not evidence of nefarious gamesmanship."  (ECF No. 132 at 3.)  For the purposes of this Order only, the Court assumes Plaintiffs' "clarifications" of the class definition in its reply brief are proper and will not engage in a detailed analysis of the propriety of such clarifications.

---

[2] Plaintiffs' reference to drilled under "agreements" suggests that there are separate contracts providing for drilled under payments.  The Court's understanding is that this is not the case, and the payments for wells drilled under a landowner's parcel is based on the "allocated to" language of the SOAs.  (*See* ECF No. 132 at 2.)

> But "drilled under" payments are not at issue in this lawsuit and do not stop as a result of Plaintiffs' success on their claims. Anadarko fails or refuses to grasp that just because the SOA requires payment of the full 2.5% to certain putative class members (for wells located on their SOA property), does NOT mean that Anadarko is NOT obligated to pay a proportionately-reduced amount for wells drilled off the SOA but within the spacing unit.

(*Id.*)

13

After careful consideration of the parties' arguments, the Court finds that the putative class suffers from an intractable intraclass conflict. The examples Krause provides are particularly compelling. To avoid the implication of those examples, Plaintiffs assert, variously, that: (1) the proper interpretation of the SOAs *requires* Defendants to pay more than 2.5% of production on wells that straddle the defined premises of multiple SOAs; (2) Defendants benevolently pay landowners whose land is within the spacing unit of a well drilled outside the defined premises of the relevant SOA and can stop doing so in retaliation for this lawsuit; and (3) payments on wells drilled outside the defined premises of a landowners' relevant SOA are not at issue in this litigation. (ECF No. 132 at 2.)

Plaintiffs seek to represent a class of differently situated landowners who stand to receive the largest overall payments based on different payment methodologies. (ECF No. 121 at 5–6; ECF No. 122-2 at 4.)  Plaintiffs can only avoid an intraclass conflict if it is true that the SOAs require Defendants to pay more than 2.5% of the total production value on wells with spacing units that cross SOA boundaries (a full 2.5% to the landowner with the wellhead on her land plus a proportionate payment less than 2.5% to other landowners within the well's spacing unit). But this theory just does not hold up under the "rigorous analysis" this Court must perform to ensure Plaintiffs' have carried their burden of showing that the Rule 23(a) requirements are in fact met. *Devaughn*, 594 F.3d at 1194. The Court has previously found the ambiguous language of the SOAs' payment provision could support such a reading, (*see* ECF No.115 at 9–10); however, the fact that any other reading of the SOAs language results in fundamental intraclass conflict convinces the Court that this litigation is not appropriate

14

for classwide resolution. See Daye, 313 F.R.D. at 164.

Ultimately, the underlying contract dispute in this case is over how a finite, contracted-for payment should be allocated between landowners subject to various SOAs. Dividing revenue streams among multiple parties will almost always—as is the case here—create winners and losers, depending on how the division is made. The Court finds that Plaintiffs stand to gain millions of dollars collectively from prevailing in this action, but some absent members of the putative class benefit from the status quo and stand to lose from the payment methodology Plaintiffs' assert.[3]

As such, the Court finds the Plaintiffs cannot adequately represent the class, and this action is not appropriate for classwide adjudication.

## B. Rule 23(b) Factors

Because the Court finds that not all Rule 23(a) requirements are met, it does not analyze Plaintiffs' Rule 23(b) arguments.

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Plaintiffs' Corrected Motion for Class Certification and Brief in Support (ECF No. 104) is DENIED;

2. The parties' Joint Motion for Oral Argument Regarding Class Certification

---

[3] The Court stresses that while its analysis "overlap[s] with the merits of [Plaintiffs'] underlying claim," this Order is not to be construed as the Court taking any position on the merits of the actual dispute. As the Court previously ruled, the payment provision is "ambiguous on its face." (ECF No. 115 at 10.) It very well may be that Plaintiffs are entitled to the full 2.5% production value of the wells drilled on their respective SOAs (allocated based on their share of the SOAs' defined premises). The Court's ruling today is limited to holding that the risk this litigation presents to absent members of the putative class who are differently situated from Plaintiffs makes this action inappropriate for classwide resolution.

15

    (ECF No. 125) is DENIED AS MOOT; and

3. The parties are DIRECTED to jointly contact the chambers of Magistrate Judge S. Kato Crews on or before **November 7, 2022**, to set a status conference, or such other proceeding as Judge Crews deems appropriate, to determine the next steps the Court and parties should undertake to move this litigation forward.

Dated this 2nd day of November, 2022.

              BY THE COURT:

              _____
              William J. Martínez
              United States District Judge