**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-2352-WJM-JPO

BOX ELDER KIDS, LLC,
C C OPEN A, LLC, and
GUEST FAMILY TRUST, by its Trustee CONSTANCE F. GUEST, individually and on
behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

ANADARKO E & P ONSHORE, LLC,
ANADARKO LAND CORPORATION, and
KERR-MCGEE OIL AND GAS ONSHORE, LP,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' PARTIAL
MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

---

In this oil and gas dispute, Anadarko E & P Onshore, LLC, Anadarko Land

Corporation, and Kerr-McGee Oil and Gas Onshore, LP ("KMOG") (collectively,

"Defendants") file a second motion for summary judgment against Plaintiffs Box Elder

Kids, LLC, C C Guest A, LLC, and the Guest Family Trust, by its Trustee Constance F.

Guest, individually and on behalf of themselves and all others similarly situated

(collectively, "Plaintiffs"), arguing that Plaintiffs' breach of contract claim is time-barred

by the applicable statute of limitations.  (ECF No. 192.)  Plaintiffs file a cross motion for

partial summary judgment, arguing that their interpretation of the ambiguous contract

provision at issue is "overwhelmingly support[ed]" by the relevant parol evidence.  (ECF

No. 196.)  Both summary judgment motions are fully briefed.  (*See also* ECF Nos. 194,

201, 203, 208.)

For the following reasons, the Court grants in part and denies in part Plaintiffs' partial summary judgment motion, and denies Defendants' summary judgment motion.

## I. BACKGROUND

Plaintiffs own surface land in Weld County, Colorado.  (ECF No. 62 at 4.)  Box Elder and CC Open A own the surface lands on contiguous pieces of property in Section 25 of Township 2 North, Range 65 West.  (*Id.* at 5.)  Guest Family Trust owns the surface lands in the southwest quarter of Section 13, Township 2 North, Range 65 West, which is one mile north of Box Elder's and CC Open A's lands.  (*Id.*)

Anadarko Land owns the interests in the mineral estate under Plaintiffs' lands, but it does not itself develop or operate oil and gas wells.  (*Id.* at 4; ECF No. 72 at 4.)  Instead, it leases the right to explore for and develop the mineral estate beneath Plaintiffs' lands to operators, including its affiliate KMOG, an entity that drills and operates oil and gas wells.  (ECF No. 62 at 5.) KMOG operates all of the oil and gas wells at issue on Plaintiffs' lands.  (*Id.*)  There are 46 wells drilled on Plaintiffs' lands, which produce oil and gas from both inside and outside the boundaries of Plaintiffs' surface lands.  (*Id.*)

### A.    Relevant Agreements

The minerals under Box Elder's surface lands are subject to an oil and gas lease entered into between Union Pacific Resources Company as lessor and United States Exploration, Inc. as lessee on May 15, 1998, and recorded at Reception No. 2614700 in the Weld County Clerk and Recorder's Office.  (*Id.*)  The minerals under CC Open A's and Guest Family Trust's surface lands are subject to an oil and gas lease entered into between Union Pacific Railroad Company as lessor and Pan American Petroleum

Corporation as lessee on January 8, 1971, and recorded at Reception No. 1561890 in the Weld County Clerk and Recorder's Office. (*Id.*) All of the wells that produce or produced oil and gas from Plaintiffs' lands are subject to one of these two leases. (*Id.*) Defendants contend that Anadarko Land is the successor-in-interest lessor and KMOG is the successor-in-interest lessee of the two leases. (*Id.*)

Box Elder's and CC Open A's predecessor-in-title to their respective surface lands, Zelda H. Shaklee, entered into a surface owner agreement ("SOA") (the "Shaklee SOA") on November 3, 1989, with Anadarko Land's predecessor-in-title to the minerals, Union Pacific Resources. (*Id.*) The Shaklee SOA is recorded at Reception No. 2198107 in the Weld County Clerk and Recorder's Office. (*Id.*)

Guest Family Trust's predecessors-in-title to the surface lands, Raymond R. Guest and Constance F. Guest, entered into a SOA (the "Guest SOA") on June 20, 1973, with Champlin Petroleum Company (now Anadarko E&P). (*Id.*; ECF No. 72 at 7.) The Guest SOA is recorded at Reception No. 1622005 in the Weld County Clerk and Recorder's Office. (ECF No. 62 at 7.)

Section 2 of the Shaklee SOA contains the following payment provision, which gives the surface owner a contractual right to cash payments based on the value of oil and gas produced from or allocated to the lands covered by the SOAs:

> [Anadarko] agrees, so long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises or allocated thereto under the provisions of a unitization agreement, to pay or cause to be paid to the Landowner in cash the value (which shall never be greater than the amount realized by [Anadarko] from the sale of such production) on the premises of two and one-half percent (2-1/2%) of all the oil and gas and associated liquid hydrocarbons hereafter produced, saved, and marketed therefrom or allocated thereto as aforesaid, . . .

3

(*Id.*)  The Guest SOA contains a nearly identical payment provision, except that it omits the explanatory parenthetical.  (*Id.*)

The SOAs define the term "unitization agreement" as follows:

> [A]ny operating agreement, or any other agreement covering the exploration or development for or the production of oil, gas or associated liquid hydrocarbons, or any pooling, communitization, unit or other agreement whereby the described premises may be included with other lands in proximity thereto as a unit area under a plan of unit or joint exploration, development and operation.

(*Id.*)

Plaintiffs also entered into Surface Use Agreements and Surface Damage Agreements to compensate them "for any and all normal and customary detriment, depreciation, injury or damage to the Lands or crops growing thereon that may occur as a result of [KMOG's] drilling and completion operations on the Lands."  (*Id.*)

## B.    Modification of the SOA Payments

Until 2010, Anadarko paid surface owners whose lands were subject to an SOA 2.5% of the value of all the oil and gas produced from a well located on their lands, including oil and gas allocated to other lands.  (*Id.*)  Defendants contend that, as a result, "surface owners without wellheads on their surface lands were not paid on oil and gas produced from and allocated to the minerals underneath their lands produced by a wellhead off their surface lands."  (*Id.*)

Thereafter, Anadarko sent Plaintiffs letters, which stated the following:

> The [SOA] payments have generally been made to the owner of surface upon which a well has been located without consideration to language contained in the [SOA] providing that, under certain circumstances, such payments should be allocated among various surface owners.  While in the past

this practice may not have resulted in a discrepancy between the recipient(s) of the [SOA] payments despite the applicability of the allocation language, a number of recent developments in the Wattenberg Field have given rise to a different result.  Two examples of these recent developments are the increased in-fill drilling and use of directional and horizontal drilling by industry.  Other factors which have highlighted the need to consider the allocation language in the [SOA] include the increased surface development in the area, the failure of surface owners to notify Anadarko of sales and transfers of surface interests, the limited production information Anadarko receives from certain of its lessees, and recent regulatory and statutory changes impacting the development of oil and gas resources in the Wattenberg Field.

The numerous unforeseen changes in the legal, business and surface use environments, *dictate that Anadarko adjust the calculation of the [SOA] payments to give effect to the language providing for allocation of such payments among certain surface owners.*  Accordingly, Anadarko has been in the process of reviewing its records to determine how all of the surface owners in the Wattenberg field are being paid under the [SOA].  *The [SOA] payments will be adjusted and paid in the proportion that a surface owner's acreage which is (i) covered by a [SOA] and (ii) located within the boundaries of a drilling and spacing unit (as established for each well by the Colorado Oil and Gas Conservation Commission rules and regulations), bears to the total acreage located within the boundaries of such drilling and spacing unit.  Anadarko's review of its records and subsequent adjustments to payments may result in a change in how your [SOA] is paid.  Your [SOA] payment may be adjusted upward or downward depending on the circumstances.*  Currently, Anadarko has no plan to make any adjustments or to recoup for [SOA] payments previously paid to you.

(*Id.*; ECF Nos. 62-9, 62-10) (emphases added).

Defendants contend that, after 2010: (1) KMOG paid Plaintiffs for the oil and gas

allocated to the Plaintiffs' lands for each of the 46 wells in direct proportion to each

Plaintiff's share of the surface relative to the total area of the applicable spacing or

pooling agreement; and (2) Anadarko paid each Plaintiff on the value of oil and gas
produced from wells located off Plaintiffs' lands that are allocated to the Plaintiffs' land
under a unitization agreement.  (ECF No. 62 at 11.)  Plaintiffs deny that Anadarko paid
them the correct value of oil and gas produced from wells located off the Plaintiffs' lands
that are allocated to Plaintiffs' land under a unitization agreement.  (ECF No. 72 at 12.)

**C.    Procedural History**

Plaintiffs initiated this lawsuit in August 2020, and filed the First Amended Class
Action Complaint and Demand for Jury Trial in October 2020,[1] wherein they asserted
one count for breach of contract for underpayments based on Defendants' proportional
allocation interpretation of the SOAs, as well as Defendants' alleged unlawful deduction
of certain costs, unlawful embedding deduction, and reduction volumes on check
details.  (ECF Nos. 1, 25.)

Defendants first moved for summary judgment in July 2021.  (ECF No. 62.)
Therein, they argued that they did not breach their contract with Plaintiffs because the
change in their payment methodology was consistent with Section 2 of the SOAs.  (*Id.*
at 13.)  Specifically, Defendants argued that, "[b]ecause all oil and gas production
attributable to the 46 wells on the Plaintiffs' lands are subject to unitization agreements,
Plaintiffs are not entitled to any percentage of the value of the oil and gas allocated to
other lands," and that "[t]he SOA payment provision does not vary the payment
methodology based on the physical location of a wellhead."  (*Id.* at 17–18.)

Plaintiffs interpreted the contract differently.  They asserted that Defendants' new
payment practices violate the SOAs because each "SOA, on its face and by its terms,

---

[1] The Court denied Plaintiffs' motion for class certification.  (ECF No. 144.)

requires payment to Plaintiffs of 2.5% on 100% of the production from wells on their land (*i.e.*, the way Defendants and their predecessors paid them for +/- 80 years)." (ECF No. 72 at 15–16.)  According to Plaintiffs, "the calculation of the production payment is different for SOA lands on which there are wells and facilities from which oil and gas is 'produced, saved and marketed' and SOA lands that have no surface disturbance, but minerals are being drained."  (*Id.* at 18–19.)

In March 2022, the Court adopted neither party's interpretation of the contract, instead concluding that "Section 2 is ambiguous on its face."  (ECF No. 115 at 10.)  The Court explained, "While the Court recognizes that all of Plaintiffs' 46 wells are subject to a unitization agreement, the undersigned cannot conclude that the plain language of the SOAs provide that Plaintiffs are not entitled to any percentage of the value of the oil and gas allocated to other lands.  On the other hand, the Court also cannot conclude that the plain language of the SOAs clearly sets forth the two different payment scenarios articulated by Plaintiffs."  (*Id.*)  Thus, recognizing that the meaning of an ambiguous contract provision "'is generally an issue of fact to be determined in the same manner as other factual issues,'" the Court denied Defendants' summary judgment motion.  (*Id.* at 10 (quoting *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005)).)  The Court instructed that, to ascertain the meaning of Section 2 of the SOA, the trier of fact would need to consider "'competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance.'"  (*Id.*)

In October 2023, Defendants obtained leave from the Court to file a second motion for summary judgment, this time arguing that Plaintiffs' breach of contract claim

is barred by the applicable statute of limitations.  (ECF No. 192.)  According to
Defendants, their 2010 letter informing Plaintiffs of the change in their payment
methodology constituted a repudiation, which started the clock on "either Colorado's
three-year period for 'contract actions' or its six-year period for actions to recover a
debt."  (*Id.* at 2.)  Consequently, Defendants argue that Plaintiffs' breach of contract
claim, filed in 2020, is time-barred.  (*Id.*)

Plaintiffs filed a response opposing Defendants' summary judgment motion,
primarily[2] arguing that (1) as a matter of law, "Colorado [law] is clear that 'claims for
monthly underpayments of natural gas royalties accrued, for limitations purposes, on
the date the royalties actually became due, as specific claims for money owed, rather
than upon discovery of the underpayments, as generally claims for breach of contract,'"
and (2) as a matter of fact, Defendants' 2010 letter did not constitute a repudiation when
viewed in the light most favorable to Plaintiffs.  (ECF No. 194 at 1–3.)  Defendants filed
a reply to Plaintiffs' opposition brief.  (ECF No. 201.)

In November 2023, Plaintiffs filed a cross motion for partial summary judgment,
arguing that, "[d]espite having filed its first motion for summary judgment on this issue
with over 120 exhibits in support, and having produced nearly 25,000 pages of
documents during the last three years of discovery in this case, Anadarko has come
forward with no evidence that would create a genuine dispute as to either the original
parties' intent or prior course of conduct."  (ECF No. 196 at 3) (footnote omitted).

---

[2] Plaintiffs list three reasons for why they believe Defendants' statute of limitations
argument is flawed, but in the Court's view, their second and third reasons are sufficiently
related such that the Court can consider them together.  (*See* ECF No. 194 at 3 (arguing in their
third point that, "as a general jurisprudential matter," when a cause of action accrues and
therefore is barred by a statute of limitations is an issue of fact).)

According to Plaintiffs, the course of dealings between the parties prior to 2010 "one-sidedly support[s] [their] interpretation of [Section 2]."  (*Id.* at 10.)  Moreover, Plaintiffs continue, "Colorado follows the 'generally accepted rule' that oil and gas leases are 'strictly construe[d]' . . . 'against the lessee and in favor of the lessor.'"  (*Id.* (quoting *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 901–02 (Colo. 2001)).)  Thus, Plaintiffs claim they are entitled to partial summary judgment on the duty and breach elements of their breach of contract claim.  (*Id.* at 11 ("Given the undisputed facts, under the law and the policy judgments that courts have described as the basis for holding that ambiguity in these agreements is construed against oil/gas companies, the Court must render judgment in favor of the Plaintiff landowners.")).)  They also ask the Court to grant summary judgment on several of Defendants' affirmative defenses.  (*Id.* at 20.)

Defendants respond that their interpretation of Section 2 gives its ambiguous terms "their well-established trade usage meaning" and "also conforms to industry custom and practice, the testimony of the parties and experts, and the parties' course of dealing over the last decade as to the wells at issue in the case."  (ECF No. 203 at 4.)  In addition to relying on industry custom and practice, Defendants also argue that the parties' conduct between 2010 and 2020—during which time Defendants paid Plaintiffs pursuant to their interpretation of the contract "without objection from Plaintiffs"—refutes Plaintiffs' argument that the course of dealings "one-sidedly" supports only their interpretation.  (*Id.* at 25.)

In their reply, Plaintiffs insist that "[a]mbiguity in the language of the contract cannot legitimately be resolved in Anadarko's favor" because the "best evidence of [the parties'] intent," *i.e.*, the "conduct and course of performance of the original contracting

parties," shows that Defendants must pay the landowners "2.5% of production from any

well located on their SOA-described premises."  (ECF No. 206 at 1.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.

Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III. ANALYSIS

## A.    Defendants' Motion for Summary Judgment

Defendants contend that Plaintiffs' breach of contract claim is barred by the

applicable statute of limitations because Defendants' letter, sent in 2010, constituted a

repudiation, thereby starting the clock on Plaintiffs' breach of contract claim, filed in

2020.  (ECF No. 192 at 9.)  But because the Court concludes that there are genuine

issues of material fact as to whether Defendants' 2010 letter constitutes a repudiation,

Defendants are not entitled to summary judgment.

1.    **Governing Law**

As a preliminary matter, the Court addresses the parties' debate regarding the law governing Defendants' statute of limitations defense.  Plaintiffs argue that claims for monthly underpayments of oil and gas royalties, like those here, accrue when the royalty payments become due.  (ECF No. 194 at 1.)  Additionally, they argue that, "where there is a continuing contractual obligation, as here, the statute of limitations does not bar a breach of contract suit in its entirely" but instead "simply limits a plaintiff's ability to recover damages to only those injuries incurred during the limitations period immediately preceding the suit."  (ECF No. 194 at 13–14.)  Defendants respond that "Plaintiffs cite the general rule for partial breaches of continuous contracts but ignore that the rule is subject to repudiation."  (ECF No. 192 at 6.)

In the Court's view, the parties' positions can be reconciled.  As Plaintiffs point out, the Colorado Supreme Court has clearly held that a claim for monthly oil and gas underpayments accrues on the date the royalty payments become due.  *See BP Am. Prod. Co. v. Patterson*, 185 P.3d 811, 812 (Colo. 2008) (holding that royalty owners' claims for underpayment of natural gas royalties accrued "on the date the royalties actually become due"); *see also Neuromonitoring Assoc. v. Centura Health Corp.*, 351 P.3d 486, 492 (Colo. App. 2012) (explaining that, in continuous contracts, "'generally a new claim accrues for each separate breach' and the plaintiff 'may assert a claim for damages from the date of their first breach within the period of limitation'" (quoting *Noonan v. Nw. Mut. Life Ins. Co.*, 687 N.W.2d 254, 262 (Wis. App. 2004))).

But, as Defendants point out, a repudiation can constitute a total breach, thereby starting the statute of limitations clock when the repudiation occurs.  (ECF No. 192 at 7.)

Indeed, while each underpayment can generally be its own separate, partial breach in an installment or continuous contract, *see Neuromonitoring Assoc.*, 351 P.3d at 492, such contracts can also be totally breached by a repudiation, *see Hi-Lite Prods. Co. v. Am. Home Prods. Corp.*, 11 F.3d 1402, 1408–09 (7th Cir. 1993) ("A continuous contract, however, is capable not only of a series of partial breaches but also a single total breach by repudiation or a material failure of performance."); *see also Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252, 255 (10th Cir. 1981) (acknowledging that continuous contracts "are capable of a series of 'partial' breaches, *as well as of a single total breach by repudiation* . . . .") (emphasis added); *Strategis Asset Valuation and Management Inc., v. Pacific Mut. Life Ins. Co.*, 805 F.Supp. 1544, 1550 (D. Colo. 1992) ("Where an obligor repudiates a duty before he has committed a breach by nonperformance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.").  Notably, neither *Patterson* nor *Neuromonitoring Association*, on which Plaintiffs principally rely, suggest that continuous contracts cannot be repudiated.

Here, there are two statute of limitations statutes that appear to potentially apply. Section 13-80-101(1)(a), C.R.S. 2023, provides a three-year limitation period for "all contract actions" but includes an exception for "those specific kinds of contract actions singled out for a six-year limitation period elsewhere."  *See BP Am. Prod. Co.*, 185 P.3d at 814.  "Section 13–80–103.5(1)(a) designates a six-year limitation period for all actions to recover a liquidated debt or an unliquidated, determinable amount of money due," as well as "any instrument securing the payment of or evidencing any debt."  *Id.* (internal quotation marks omitted); § 13-80-103.5(1)(a), C.R.S. 2023.  "An amount is

liquidated or determinable for purposes of section 13–80–103.5(1)(a) if the amount due
is ascertainable by reference to an agreement or by simple computation, even if
reference must be made to facts external to the agreement."  *Neuromonitoring Assoc.*,
351 P.3d at 489.

The Court concludes, over no apparent objection from the parties,[3] that the
claimed underpayments at issue here are unliquidated, determinable amounts of
money, and that the six-year statute of limitations period therefore applies to Plaintiffs'
breach of contract claim.  *See* § 13-80-103.5(1)(a).  Hence, if Defendants can prove that
their 2010 letter constituted a total breach by way of a repudiation, they could, in theory,
prevail on their statute of limitations defense.

2.      **Whether the 2010 Letter Constitutes a Repudiation is a Disputed Fact**

Whether the 2010 letter constitutes a repudiation, however, is a disputed
question of fact.  "In order to constitute an anticipatory breach of contract there must be
a definite and unequivocal manifestation of intention on the part of the repudiator that he
will not render the promised performance when the time fixed for it in the contract
arises."  *Johnson v. Benson*, 725 P.2d 21, 25 (Colo. App. 1986) (citing 4 A. Corbin,
Contracts § 973 (1951); Restatement (Second) of Contracts § 250 comment b (1981)
("In order to constitute a repudiation, a party's language must be sufficiently positive to
be reasonably interpreted to mean that the party will not or cannot perform.")).
Anticipatory repudiation requires an "overt communication of intention or an action

---

[3] (*See* ECF No. 192 at 15 (asserting that "Plaintiffs' breach of contract claim accrued
when they received Anadarko's 2010 letter" and that "the statute of limitations for the entire
contract commenced in 2010" "[u]nder either Colorado's three-year limitations period . . . or its
six year period . . . .")).)

which . . . demonstrates a clear determination not to continue with performance."
*Albright v. McDermond*, 14 P.3d 318, 324 (Colo. 2000)*; see also Lake Durango Water
Co., Inc. v. Pub. Utils. Comm'n*, 67 P.3d 12, 21 (Colo. 2003) (citing *Meinhardt v. Inv.
Builders Props. Co.*, 518 P.2d 1376, 1379 (Colo. App. 1973)) ("A repudiation of a
contract must consist of a present, positive, unequivocal refusal to perform the contract,
not a mere threat to abandon its obligations under the contract.").

The parties disagree whether Defendants' 2010 letter contains the necessary
ingredients to qualify as a repudiation.  Plaintiffs aver that "Anadarko's 2010 letter was
neither definite nor unequivocal," and that it did not "manifest an intent that Anadarko
would no longer perform under the SOA when the time for payments arose."  (ECF No.
194 at 18.)  Instead, Plaintiffs argue that the letter is vague and equivocal, and that it
"*assures* SOA holder that Anadarko will be paying them in accord with the SOA terms."
(*Id.*) (emphasis in original).  They emphasize language in the letter that Anadarko was
"'review[ing]' and 'adjust[ing]' its pay practices to give effect to the SOA language, and
that this 'may result in a change' and payments 'may be adjusted upward or
downward.'"  (*Id.* at 19.)

Defendants counter that "Plaintiffs' own pleadings concede all aspects of
repudiation."  (ECF No. 201 at 11.)  Defendants focus on the substantial similarity
between the letter's language laying out Defendants' intent to change its payment
methodology and Plaintiffs' complaint, which alleges that "Anadarko breached by
proportionately reducing Surface Owner Payment by the fraction of the acreage covered
by the SOA divided by the acreage in the drilling and spacing unit."  (*Id.*) (internal
quotation marks omitted).  Defendants stress that Plaintiffs' complaint alleges that it was

Anadarko's "*unliteral change* in payment practices in 2010, *when it mailed letters to surface owners notifying them of a change in payment policy and began to make allocated payments* to surface owners . . . is *entirely inconsistent* with the original parties' performance and course of dealings under the SOA terms." (*Id.* at 12.) (Emphases in original.) Given this symmetry between the 2010 letter and the complaint, Plaintiffs argue that the letter was not vague or equivocal. (*Id.*)

The Court is not convinced that the undisputed facts establish that Defendants' 2010 letter constitutes a repudiation. True, it is clear from the letter that Defendants signaled an intent to change the methodology by which they calculated the monthly royalty payments. But the letter's language was not so "sufficiently positive to be reasonably interpreted to mean that [Defendants] w[ould] not or cannot perform." Restatement (Second) of Contracts § 250 comment b (1981). On the contrary, the letter informed the Plaintiffs that various changes in circumstances "dictate that Anadarko adjust the calculation of the [SOA] payments *to give effect to the language providing for allocation of such payments* among certain surface owners." (ECF No. 62 at 7.) (emphasis added). That is, the letter suggested an intent by Defendants *to perform* consistent with what they believed was a proper consideration of the contract's terms.

Moreover, the letter vaguely informed Plaintiffs that "Anadarko's review of its records and subsequent adjustments to payments *may result in a change* in how your [SOA] is paid," and that payments "*may be adjusted* upward or downward depending on the circumstances." (*Id.*) (emphases added). The fact that Defendants later followed through on this intent by reducing Plaintiffs' royalty payments sheds little light on

whether the letter itself "definite[ly] and unequivocal[ly] manifestat[ed] [an] intention on the part of the [Defendants] that [they] [would] not render the promised performance when the time fixed for it in the contract ar[ose]." *Johnson*, 725 P.2d at 25. As a result, the Court concludes that the question of whether the 2010 letter constitutes a repudiation should be decided by the trier of fact. *See id.* ("The determinations whether anticipatory repudiation or retraction have occurred are ordinarily questions of fact.").

**B.    Plaintiffs' Cross Motion for Partial Summary Judgment**

Plaintiffs move for summary judgment on the duty and breach elements of their breach of contract claim, arguing that the relevant parol evidence bearing on the meaning of the ambiguous provisions of Section 2 of the SOAs "overwhelmingly support[s] [their] interpretation of the SOA payment provision, and because of the special canons of construction that apply here." (ECF No. 196 at 3.) Viewing the disputed facts in the light most favorable to Defendants, the Court denies Plaintiffs' summary judgment motion.

**1.    Governing Law**

In a contract case, a motion for summary judgment allows for contract interpretation as a matter of law. *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n of State of Colo.*, 67 P.3d 12, 20 (Colo. 2003). But before a moving party can attack a contract claim on summary judgment, the moving party must first show that the contract is unambiguous and can be construed as a matter of law. *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1055 (D. Colo. 2013).

"In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the

agreement's provisions." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374

(Colo. 1990).  Mere disagreement of the parties does not necessarily indicate the

documents are ambiguous.  *Id.*  Rather, a contract is ambiguous if it is "fairly susceptible

to more than one interpretation."  *Id.*  If a contract is not ambiguous, extrinsic evidence

is not admissible to prove the parties' intent, and the parties' intent must be determined

from the terms of the contract.  *Id.*

But where, as here, a contract is ambiguous, "the meaning of its terms is

generally an issue of fact to be determined in the same manner as other factual issues."

*E. Ridge of Fort Collins, LLC*, 109 P.3d at 974.  Courts must then give effect to the

intention of the parties by considering "competent evidence bearing upon the

construction given to the instrument by the parties themselves, by their acts and

conduct in its performance."  *Id.*  Thus, when a court determines that a document is

ambiguous, it may then consider parol evidence to explain or clarify the meaning of a

document or the effect of its provisions.  *Id.*

2.    **Section 2's Meaning is a Disputed Fact**

Recall that, in denying Defendants' first summary judgment motion, the Court

found that the following language in Section 2 was ambiguous:

> [Anadarko] agrees, so long as it is receiving oil and/or gas
> production from or oil and/or gas royalties upon production
> from the described premises or allocated thereto under the
> provisions of a unitization agreement, to pay or cause to be
> paid to the Landowner in cash the value (which shall never
> be greater than the amount realized by [Anadarko] from the
> sale of such production) on the premises of two and one-half
> percent (2-1/2%) of all the oil and gas and associated liquid
> hydrocarbons hereafter produced, saved, and marketed
> therefrom or allocated thereto as aforesaid, . . .

(ECF No. 62 at 7.)

Specifically, the Court found that it was ambiguous whether, pursuant to Defendants' interpretation, "Plaintiffs are not entitled to any percentage of the value of the oil and gas allocated to other lands," or whether, pursuant to Plaintiffs' interpretation, "the plain language of the SOAs clearly sets forth the two different payment scenarios," such that they are entitled to 2.5% of all oil and gas produced from a well on their lands and produced from under other lands as well.  (ECF No. 115 at 10.)  The Court instructed that, to ascertain the meaning of Section 2, the trier of fact would need to consider "'competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance.'"  (*Id.*)

Since the Court entered this Order, the parties have backed their respective interpretations of the SOA with different parol evidence.  Plaintiffs rely on (1) the plain language of Section 2, the SOA's stated purposes, and Section 2's surrounding language distinguishing between a "working interest versus a royalty interest"; (2) the 70 years of dealings between the parties prior to 2010, during which time Defendants and their successors-in-interest paid Plaintiffs and their successors-in-interest pursuant to the Plaintiffs' current interpretation of the contract; and (3) the canon of construction that instructs courts to construe ambiguity in oil and gas contracts against the drafter and in favor of the landowner.  (ECF No. 196 at 12–19.)

Defendants, by contrast, primarily rely on parol evidence in the form of trade usage and custom and practice in support of their interpretation of Section 2.  (*See generally* ECF No. 203.)  Specifically, Defendants argue that the definition of the terms "unitization" and "allocation," as well as the phrases "produced, saved, and marketed therefrom" and "production from the described premises," are pivotal in determining

Section 2's meaning.  (*Id.* at 18, 21.)  Defendants also say that Plaintiffs' reliance on

Section 2's surrounding language, including the SOA's stated purposes and the

"working interest" and "royalty interest" terms, is misplaced and undermines their

interpretation.  (*Id.* at 22–24.)  Apart from their reliance on industry standards, Plaintiffs

maintain that the parties' course of dealings should also account for their conduct from

2010–2020, during which time Plaintiffs accepted Defendants' monthly royalty payments

pursuant to Defendants' interpretation of the Section 2 without objection.  (*Id.* at 24.)

Lastly, Defendants point out that the canon on which Plaintiffs rely is a rule of last resort

and should not be applied except when other rules of interpretation fail.  (*Id.* at 27.)

Plaintiffs reply that industry standards do "not shed light on the intent of the two

parties that entered the SOA contracts here, and, regardless, cannot be used to trump

undisputed evidence of the contracting parties' conduct and course of performance

under the agreement that supports only Plaintiffs' interpretation."  (ECF No. 208 at 5.)

Specifically, Plaintiffs argue that extrinsic evidence of industry standards is inapposite

where, as here, "one of the original contracting parties is not familiar with the industry."

(*Id*. at 6.)

The Court finds that Plaintiffs have not shown that Section 2's meaning can be

construed as a matter of law.  *Stroh Ranch Dev., LLC*, 935 F. Supp. 2d at 1055.  In the

Court's view, both parties have presented competent evidence from which a jury could

reasonably reach different conclusions as to the meaning of Section 2.  Plaintiffs have

presented evidence pertaining to the course of dealings between the parties prior to

when Defendants changed their interpretation in 2010.  *See E. Ridge of Fort Collins,

LLC*, 109 P.3d at 974 (finding "the conduct of the parties before the controversy arose to

be a reliable test of their interpretation of the agreement").  Defendants, for their part,

have presented evidence of industry standards that appear to support their

interpretation of the disputed Section 2 terms.  *See Bledsoe Land Co LLLP v. Forest Oil
Corp.*, 277 P.3d 838, 845 (Colo. App. 2011) (suggesting that whether a party has

experience "in dealing with real property issues and oil and gas leases" may be relevant

in interpreting a contract's terms); *cf. Garman v. Conoco, Inc.*, 886 P.2d 652, 660 (Colo.

1994) (explaining that industry custom can bind only those with "knowledge of its

existence" and parties who "contracted with reference to the custom") (citation omitted).

To be sure, Plaintiffs are correct that Defendants' evidence pertaining to industry

standards and customs may not ultimately be "a reliable yardstick for determining the

parties' intent," particularly because there appears to be disputed evidence as to

whether the original parties had experience dealing in oil and gas contracts.  *Garman*,

886 P.2d at 660.  (*Compare* ECF No. 208 at 6 n. 1 ("Connie Guest did not work in the

oil and gas industry") *with* ECF No. 203 at 22 n. 9 (describing Shaklee's experience

producing mineral interests with "five or six wells").).  But whether these original parties

had such industry experience, and thus, whether evidence of industry standards and

customs is relevant, is a question of fact, not of law.  The Court therefore declines

Plaintiffs' invitation not to consider Defendants' proffered industry standard evidence in

determining whether there is disputed evidence on the meaning of Section 2's

ambiguous terms.  (ECF No. 208 at 6.)

In any event, even assuming Plaintiffs' reliance on industry standards evidence is

misplaced, they present more parol evidence than just that of industry standards in

support of their interpretation of Section 2.  As discussed, Plaintiffs also aver that the

course of dealings should account for the parties' conduct from 2010–2020, during which time Plaintiffs cashed Defendants' monthly royalty payments pursuant to Defendants' interpretation of Section 2 without objection.  (*Id.* at 24.)  In the Court's view, this too is competent evidence bearing on the meaning of Section 2's disputed terms, even if such evidence may not be as persuasive as evidence before 2010.  *See Stroh Ranch Dev., LLC*, 935 F. Supp. 2d at 1055.

In sum, the Court concludes that the meaning of the ambiguous provisions of Section 2 remain a genuine issue of material fact on which both parties have presented competent parol evidence.  Thus, the meaning of these terms is "an issue of fact to be determined in the same manner as other factual issues."  *E. Ridge of Fort Collins, LLC*, 109 P.3d at 974; *see Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 530 (10th Cir. 2016) (explaining that, if a contract's "language is ambiguous, interpretation would be for the trier of fact, not the court"); *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (2013) ("[I]f the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary declaratory judgment is inappropriate.").

## C.    Defendants' Various Affirmative Defenses

Finally, the Court briefly addresses Plaintiffs' motion for summary judgment on Defendants' various affirmative defenses.  (ECF No. 196 at 20.)  Specifically, Plaintiffs seek summary judgment on Defendants' defenses of failure to state a claim; statute of limitations; laches; estoppel and waiver; and payment, release, and accord and satisfaction.  (*Id.* at 20–23.)

Pursuant to the parties' agreement, the Court strikes Defendants' failure to state a claim defense.  (ECF No. 203 at 28 n. 10.)

But the Court otherwise denies Plaintiffs' motion for summary judgment on Defendants' remaining affirmative defenses. As for the statute of limitations defense, the Court has already concluded that Colorado law permits Defendants' defense based on its repudiation theory and that there are genuine issues of material fact as to whether the 2010 letter constituted a repudiation. As for the estoppel and waiver defenses, the Court concludes that, contrary to Plaintiff's argument, there is a dispute of material fact as to whether Plaintiffs continued to perform under the contracts despite their knowledge of the alleged breach. (ECF No. 203 at 29.) Likewise, the Court finds that there are disputed issues of fact as to whether Defendants can satisfy the disadvantage or prejudice element of laches. (*See id.* ("Anadarko could certainly have taken Plaintiffs' current position into account and used it to inform whether to drill wells on Plaintiffs' SOA lands.")).)

Lastly, it is somewhat unclear whether Plaintiffs still seek summary judgment on Defendants' payment, release, and accord and satisfaction defense. (*See* ECF No. 208 at 11 ("The only triable issue that remains in this case relates to damages. This defense should be addressed at trial.").) To the extent this argument remains, however, Plaintiffs have sufficiently presented disputed facts that Plaintiffs "accepted Anadarko's monthly SOA payments on an allocated basis." (ECF No. 203 at 30.)

### IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that:

1.    Plaintiff's partial motion for summary judgment (ECF No. 196) is GRANTED IN PART AND DENIED IN PART as set forth above; and

2.    Defendant's motion for summary judgment (ECF Nos. 192) is DENIED.

Dated this 21st day of August, 2024.

BY THE COURT:

William J. Martinez
Senior United States District Judge