**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 20-cv-2352-WJM-JPO

BOX ELDER KIDS, LLC,
C C OPEN A, LLC, and
GUEST FAMILY TRUST, by its Trustee CONSTANCE F. GUEST, individually and on
behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

ANADARKO E & P ONSHORE, LLC,
ANADARKO LAND CORPORATION, and
KERR-MCGEE OIL AND GAS ONSHORE, LP,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'**
**MOTION TO DISQUALIFY EXPERT WITNESS JAMIE JOST**

---

      In this oil and gas dispute, Plaintiffs Box Elder Kids, LLC, C C Guest A, LLC, and

the Guest Family Trust, by its Trustee Constance F. Guest, individually and on behalf of

themselves and all others similarly situated (collectively, "Plaintiffs") move to disqualify

expert witness Jamie Jost, proffered by Defendants Anadarko E & P Onshore, LLC,

Anadarko Land Corporation, and Kerr-McGee Oil and Gas Onshore, LP ("KMOG")

(collectively, "Defendants").  (ECF No. 195.)  This issue is fully briefed.  (*See also* ECF

Nos. 202, 207.)

      For the following reasons, the Court grants in part and denies in part Plaintiffs'

motion.

# I. PERTINENT BACKGROUND

Plaintiffs own surface land in Weld County, Colorado.  (ECF No. 62 at 4.)  Box Elder and CC Open A own the surface lands on contiguous pieces of property in Section 25 of Township 2 North, Range 65 West.  (*Id.* at 5.)  Guest Family Trust owns the surface lands in the southwest quarter of Section 13, Township 2 North, Range 65 West, which is one mile north of Box Elder's and CC Open A's lands.  (*Id.*)

Anadarko Land owns the interests in the mineral estate under Plaintiffs' lands, but it does not itself develop or operate oil and gas wells.  (*Id.* at 4; ECF No. 72 at 4.)  Instead, it leases the right to explore for and develop the mineral estate beneath Plaintiffs' lands to operators, including its affiliate KMOG, an entity that drills and operates oil and gas wells.  (ECF No. 62 at 5.)  KMOG operates all of the oil and gas wells at issue on Plaintiffs' lands.  (*Id.*)  There are 46 wells drilled on Plaintiffs' lands, which produce oil and gas from both inside and outside the boundaries of Plaintiffs' surface lands.  (*Id.*)

## A.    Relevant Agreements

The minerals under Box Elder's surface lands are subject to an oil and gas lease entered into between Union Pacific Resources Company as lessor and United States Exploration, Inc. as lessee on May 15, 1998.  (*Id.*)  The minerals under CC Open A's and Guest Family Trust's surface lands are subject to an oil and gas lease entered into between Union Pacific Railroad Company as lessor and Pan American Petroleum Corporation as lessee on January 8, 1971.  (*Id.*)  All of the wells that produce or produced oil and gas from Plaintiffs' lands are subject to one of these two leases.  (*Id.*)  Defendants contend that Anadarko Land is the successor-in-interest lessor and KMOG is the successor-in-interest lessee of the two leases.  (*Id.*)

Box Elder's and CC Open A's predecessor-in-title to their respective surface lands, Zelda H. Shaklee, entered into a surface owner agreement ("SOA") on November 3, 1989, with Anadarko Land's predecessor-in-title to the minerals, Union Pacific Resources.  (*Id.*)  Guest Family Trust's predecessors-in-title to the surface lands, Raymond R. Guest and Constance F. Guest, entered into a SOA on June 20, 1973, with Champlin Petroleum Company (now Anadarko E&P).  (*Id.*; ECF No. 72 at 7.)

Section 2 of the Shaklee SOA contains the following payment provision, which gives the surface owner a contractual right to cash payments based on the value of oil and gas produced from or allocated to the lands covered by the SOAs:

> [Anadarko] agrees, so long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises or allocated thereto under the provisions of a unitization agreement, to pay or cause to be paid to the Landowner in cash the value (which shall never be greater than the amount realized by [Anadarko] from the sale of such production) on the premises of two and one-half percent (2-1/2%) of all the oil and gas and associated liquid hydrocarbons hereafter produced, saved, and marketed therefrom or allocated thereto as aforesaid, . . .

(*Id.*)  The Guest SOA contains a nearly identical payment provision, except that it omits the explanatory parenthetical.  (*Id.*)

The SOAs define the term "unitization agreement" as follows:

> [A]ny operating agreement, or any other agreement covering the exploration or development for or the production of oil, gas or associated liquid hydrocarbons, or any pooling, communitization, unit or other agreement whereby the described premises may be included with other lands in proximity thereto as a unit area under a plan of unit or joint exploration, development and operation.

(*Id.*)

Plaintiffs also entered into Surface Use Agreements and Surface Damage

Agreements to compensate them "for any and all normal and customary detriment, depreciation, injury or damage to the Lands or crops growing thereon that may occur as a result of [KMOG's] drilling and completion operations on the Lands."  (*Id.*)

**B.    Modification of the SOA Payments**

Until 2010, Anadarko paid surface owners whose lands were subject to an SOA 2.5% of the value of all the oil and gas produced from a well located on their lands, including oil and gas allocated to other lands.  (*Id.*)  Defendants contend that, as a result, "surface owners without wellheads on their surface lands were not paid on oil and gas produced from and allocated to the minerals underneath their lands produced by a wellhead off their surface lands."  (*Id.*)

Thereafter, Anadarko sent Plaintiffs letters, which stated the following:

> The [SOA] payments have generally been made to the owner of surface upon which a well has been located without consideration to language contained in the [SOA] providing that, under certain circumstances, such payments should be allocated among various surface owners.  While in the past this practice may not have resulted in a discrepancy between the recipient(s) of the [SOA] payments despite the applicability of the allocation language, a number of recent developments in the Wattenberg Field have given rise to a different result.  Two examples of these recent developments are the increased in-fill drilling and use of directional and horizontal drilling by industry.  Other factors which have highlighted the need to consider the allocation language in the [SOA] include the increased surface development in the area, the failure of surface owners to notify Anadarko of sales and transfers of surface interests, the limited production information Anadarko receives from certain of its lessees, and recent regulatory and statutory changes impacting the development of oil and gas resources in the Wattenberg Field.
>
> The numerous unforeseen changes in the legal, business and surface use environments, dictate that Anadarko adjust the calculation of the [SOA] payments to give effect to the

> language providing for allocation of such payments among certain surface owners.  Accordingly, Anadarko has been in the process of reviewing its records to determine how all of the surface owners in the Wattenberg field are being paid under the [SOA].  The [SOA] payments will be adjusted and paid in the proportion that a surface owner's acreage which is (i) covered by a [SOA] and (ii) located within the boundaries of a drilling and spacing unit (as established for each well by the Colorado Oil and Gas Conservation Commission rules and regulations), bears to the total acreage located within the boundaries of such drilling and spacing unit.  Anadarko's review of its records and subsequent adjustments to payments may result in a change in how your [SOA] is paid.  Your [SOA] payment may be adjusted upward or downward depending on the circumstances.  Currently, Anadarko has no plan to make any adjustments or to recoup for [SOA] payments previously paid to you.

(*Id.*; ECF Nos. 62-9, 62-10).

Defendants contend that, after 2010: (1) KMOG paid Plaintiffs for the oil and gas allocated to the Plaintiffs' lands for each of the 46 wells in direct proportion to each Plaintiff's share of the surface relative to the total area of the applicable spacing or pooling agreement; and (2) Anadarko paid each Plaintiff on the value of oil and gas produced from wells located off Plaintiffs' lands that are allocated to the Plaintiffs' land under a unitization agreement.  (ECF No. 62 at 11.)  Defendants argue that this payment methodology, which they refer to as the "allocation method," is derived from a proper interpretation of the contract.  (*See, e.g.*, ECF No. 201 at 10.)

Plaintiffs deny that Anadarko paid them the correct value of oil and gas produced from wells located off the Plaintiffs' lands that are allocated to their land under a unitization agreement.  (ECF No. 72 at 12.)  In Plaintiffs' view, Anadarko is obligated to pay "the surface owner the full 2.5% of production from each well located on their SOA land," regardless of whether the oil and gas is produced from off their lands.  (ECF No.

196 at 18.)  They refer to this interpretation of the contract as the "well-spot method."
(*See, e.g., id.*)

The Court denied Defendants' first motion for summary judgment, concluding
that "Section 2 is ambiguous on its face."  (ECF No. 115 at 10.)  Recognizing that the
meaning of an ambiguous contract provision "'is generally an issue of fact to be
determined in the same manner as other factual issues,'" the Court instructed that, to
ascertain the meaning of Section 2 of the SOA, the trier of fact would need to consider
"'competent evidence bearing upon the construction given to the instrument by the
parties themselves, by their acts and conduct in its performance.'"  (*Id.*)

Since then, the parties have backed their respective interpretations of the SOA
with different parol evidence.  In support of the "well-spot method" interpretation,
Plaintiffs rely on (1) the plain language of Section 2, the SOA's stated purposes, and
Section 2's surrounding language distinguishing between a "working interest versus a
royalty interest"; (2) the course of dealings between the parties prior to 2010, during
which time Plaintiffs assert that Defendants and their successors-in-interest paid
Plaintiffs and their successors-in-interest pursuant to the "well-spot method"; and (3) the
canon of construction that instructs courts to construe ambiguity in oil and gas contracts
against the drafter and in favor of the landowner.  (ECF No. 196 at 12–19.)

In support of the "allocation method" interpretation, Defendants primarily rely on
parol evidence in the form of trade usage and custom and practice.  (*See generally* ECF
No. 203.)  Specifically, Defendants argue that the definition of the terms "unitization"
and "allocation," as well as the phrases "produced, saved, and marketed therefrom" and
"production from the described premises," are pivotal in determining Section 2's

meaning.  (*Id.* at 18, 21.)  Defendants also say that Plaintiffs' reliance on Section 2's surrounding language, including the SOA's stated purposes and the "working interest" and "royalty interest" terms, is misplaced and undermines their interpretation.  (*Id.* at 22–24.)  Apart from their reliance on industry standards, Plaintiffs maintain that the parties' course of dealings should also account for their conduct from 2010–2020, during which time Plaintiffs accepted Defendants' monthly royalty payments pursuant to the "allocation method" without objection.  (*Id.* at 24.)  Lastly, Defendants point out that the canon on which Plaintiffs rely is a rule of last resort and should not be applied except when other rules of interpretation fail.  (*Id.* at 27.)

Hence, at bottom, this breach of contract dispute centers around the meaning of ambiguous terms in Section 2 of the parties' SOAs.  The Court now considers Plaintiffs' motion to generally disqualify Defendants' expert witness, Jamie Jost, and to prevent her from testifying as to various opinions contained her report.  (ECF No. 195.)

## II. LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert testimony.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).  Admission of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony bears the burden of proving

the foundational requirements of Rule 702 by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

To qualify as an expert, the witness must possess such "knowledge, skill, experience, training, or education" in the particular field as to make it appear that his or her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).  To establish that the proffered testimony is reliable, the reasoning or methodology underlying the testimony must be valid and must be properly applied to the facts in issue.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–94 (1993) (listing four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance).

While an expert witness's testimony must assist the jury to be deemed admissible, Fed. R. Evid. 702(a), it may not usurp the jury's fact-finding function.  *See Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).  The line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, but it is well-settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704.

Ultimately, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee's note.  "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system . . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.*

## III. ANALYSIS

Plaintiffs move to generally disqualify Jost from testifying as an expert, and to specifically preclude her from testifying as to various opinions contained in her report. (ECF No. 195 at 1.)  These opinions include:

- When Anadarko's predecessors and Plaintiffs' predecessors entered into the SOAs, the parties stated their intent that the described premises may be used for oil and gas development.

- Section 2 of the SOAs obligates Anadarko to pay Plaintiffs 2.5% of the value of the oil and gas produced from, or allocated to pursuant to a unitization agreement, the surface owner's described premises subject to the SOA.

- The SOAs do not require Anadarko to pay more than 2.5% of the value of the oil and gas allocated to the described premises under a unitization agreement.

- The SOAs do not state that Anadarko's 2.5% payment obligation is altered (either decreased or increased) as a result of the conveyance of the described premises into separate parcels.

- The SOAs do not distinguish between production from a wellhead on or off a surface owner's lands for the purpose of the SOA payment.

- Oil and gas industry terms, custom, and practice support Anadarko's payment of 2.5% of the value of the oil and gas allocated to the SOA

described premises under a unitization agreement.

- Anadarko separately compensated Plaintiffs (in other contracts) for potential surface damage related to each wellhead located on Plaintiffs' lands.

- I am not aware of any "well-spot" payments by Anadarko of 2.5% of 100% of the value of the oil and gas produced from a horizontal wellhead located on SOA described premises at any point in time.  Horizontal drilling became common in the Colorado DJ Basin after 2010.  The only SOA payment history for horizontal wellheads is Anadarko's allocated payment history since 2010.

- Anadarko's allocated payment practice for wells that produce from pooled units conforms to how the oil and gas industry allocates production to different parcels of land pool into well spacing units, a common and uniform practice that has continued for decades.

(*Id.* at 3–6.)

Plaintiffs argue that these opinions are improper because they opine on an ultimate issue; are irrelevant; are misleading and prejudicial; and are unsupported, unreliable, and incomplete.  (*Id.*)  More generally, Plaintiffs ask the Court to exclude Jost's opinions pertaining to (1) the "reasonable" interpretation of the original contracting parties' intent; (2) oil and gas industry custom; and (3) what the "correct" interpretation of the contract is.  (*Id.* at 7–9.)

At the outset, the Court notes that, while Plaintiffs label their Rule 702 motion as seeking to "disqualify" Jost as an expert witness, they focus their arguments on

specific opinions they wish to exclude from her.  That is, they do not specifically argue that Jost is not qualified "by knowledge, skill, experience, training, or education" to testify on these matters.  Fed. R. Evid. 704.  Assuming Plaintiffs challenge Jost on this basis, however, the Court is unpersuaded.  At the class certification stage of this case, the Court explained, "Jost has the requisite knowledge and experience to offer expert opinions on factual issues relevant to class certification—namely, industry custom and practice regarding oil and gas allocation, unitization, production payments, surface ownership, and the applicable contractual agreements that are all central issues to the putative class."  (ECF No. 143 at 5.)  In short, the Court's view on Jost's qualifications in the class certification stage of this case is the same for her credentials to testify on the merits.

Turning to the various opinions listed above, the Court agrees in part with Plaintiffs.  Although Plaintiffs argue that some of these opinions are inadmissible because they are not relevant, the Court finds that the opinions clear the low relevance bar set by Rule 401 because they tend to support Defendants' "allocation method" interpretation of Section 2's ambiguous terms.  *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006) (evidence is relevant if "it has any tendency to make a fact of consequence more or less probable than it would be without the evidence . . . Rule 401 is a liberal standard."); *Bethel v. Berkshire Hathaway Homestate Ins. Co.*, 596 F. Supp. 3d 1260, 1265 (D. Colo. 2022) ("Second, if the expert is sufficiently qualified, the Court must determine whether the proposed testimony is sufficiently relevant to the task at hand, such that it logically advances a material aspect of the case.") (citation omitted).

But the Court agrees with Plaintiffs insofar as they argue that some of Jost's opinions amount to contract interpretation.  "An opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704.  Nevertheless, an expert witness's testimony may not usurp the jury's fact-finding function.  *See Specht*, 853 F.2d at 808.  In other words, "an expert may not simply tell the jury what result it should reach . . . ."  *United States v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005).  Further, "expert testimony is not admissible to inform the trier of fact as to the law that it will be instructed to apply to the facts in deciding the case."  4 Jack B. Weinstein et al., Weinstein's Federal Evidence § 702.03[3] (supp. 2019) (citing, *e.g., Hygh v. Jacobs*, 961 F.2d 359, 361–62 (2d Cir. 1992) (expert witnesses may not compete with the court in instructing the jury)).

Importantly, expert testimony may not be used as a guise for putting a party's interpretation of the facts before a jury.  *See, e.g., United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1252 (D.N.M. 2015) ("When the expert opines on the basis of 'expertise' rooted in the facts of the case being tried, [the expert] is effectively arguing the case as a mouthpiece for counsel.").  In the context of a breach of contract dispute, these principles teach that the legal interpretation of ambiguous terms in a contract is not a proper subject for expert testimony.  *Id.* (citing, *e.g., Breezy Point Coop. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 35–36 (E. D. N. Y. 1994) (expert witness's proposed testimony that failure to give timely notice of loss violated terms of insurance policy was inadmissible because it would improperly interpret terms of a contract)).

Jost's opinions asserting what Section 2 of the SOAs obligates Defendants to

pay, and by what methodology, pertain to the dispositive issue the trier of fact must decide in this case. As a result, those opinions, which are effectively tantamount to contract interpretation, are inadmissible and will not be permitted.[1] *Bethel*, 596 F. Supp. 3d at 1265 ("With respect to Mr. Sands's proffered opinion about what the policy says, the Court agrees that Mr. Sands may not offer an opinion that amounts to contract interpretation.").

Relatedly, Defendants argue that Jost cannot "provide her opinion on the 'correct' interpretation of the payment provision." (ECF No. 195 at 9.) As a general matter, the Court agrees that an expert witness cannot opine on what the "correct," "incorrect," or "reasonable"[2] interpretation of a contract provision is. But it appears that Jost did not provide such an opinion but instead merely described opinions contained in Defendants' expert's report as "incorrect" a few times. (ECF No. 195 at 44–45.) As another Court in this jurisdiction has observed, experts can offer competing opinions as to whether certain evidence supports one or the other party's interpretation of a contract, but they may not assert opinions that amount to contract interpretation. *See Bethel*, 596 F. Supp. 3d at 1265 ("However, based on the

---

[1] Those opinions could conceivably include those listed as C, D, E, and F in Jost's report, among others. The Court uses the word "conceivably" because Jost is, of course, permitted to provide "[a] factual summary of the terms of the policy" in opining whether certain parol evidence, including evidence of the parties' course of dealings and industry standards and customs, supports Defendants' "allocation method" interpretation of Section 2's ambiguous terms. But Jost is prohibited from offering these opinions to the extent they seek to assert the "correct" interpretation of those terms. *Bethel*, 596 F. Supp. 3d at 1265.

[2] As mentioned, the Court has found that Section 2 is ambiguous. In other words, the Court has found that Section 2 can have multiple plausible or "reasonable" interpretations. To the extent Jost wishes to testify that the "allocation method interpretation" is a reasonably supported interpretation of the contract, that is fine. But she may not testify that such an interpretation is *the only* reasonable interpretation of the contract. Such an assertion would be tantamount to telling the jury what conclusion to reach.

statement challenged by Plaintiff, it appears that Mr. Sands is not attempting to interpret the contract.  Rather, Mr. Sands *appears to be responding to Plaintiff's expert's opinion on the topic of whether Berkshire's conduct breached industry standard.*") (emphasis added).

Plaintiffs also object to any opinions offered by Jost that discuss whether Defendants' interpretation of Section 2 is supported by oil and gas industry custom. (ECF No. 195 at 9.)  In support, they argue that such evidence is inadmissible parol evidence because, "where one party to the agreement is not familiar with the industry, like the original contracting surface landowners here, evidence of industry custom is not helpful to the trier of fact for determining the parties' intent."  (*Id.* (citing *Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 845 (Colo. App. 2011)).). Plaintiffs respond that there is no precondition to the admission of industry standards evidence based on whether all parties are familiar with the industry custom at issue. (ECF No. 202 at 4.)

The Court finds that Jost may testify as to whether industry standards evidence supports Defendants' interpretation of Section 2.  As alluded in its order denying the parties' cross motions for summary judgment (ECF No. 225 at 20), the Court agrees with Plaintiffs that evidence of industry standards may be binding only if the original contracting parties had knowledge of such standards at the time of contracting.  *See Bledsoe Land Co LLLP v. Forest Oil Corp.*, 277 P.3d 838, 845 (Colo. App. 2011) (suggesting that whether a party has experience "in dealing with real property issues and oil and gas leases" may be relevant in interpreting a contract's terms); *Garman v. Conoco, Inc.*, 886 P.2d 652, 660 (Colo. 1994)

(explaining that industry custom can bind only those with "knowledge of its existence" and parties who "contracted with reference to the custom") (citation omitted).

But as the Court further explained in its order denying summary judgment, "there appears to be disputed evidence as to whether the original parties had experience dealing in oil and gas contracts."  (*Id.*)  (*Compare* ECF No. 208 at 6 n.1 ("Connie Guest did not work in the oil and gas industry") *with* ECF No. 203 at 22 n.9 (describing Shaklee's experience producing mineral interests with "five or six wells").).  Hence, whether evidence of industry standards and customs is relevant cannot be determined until the jury decides this threshold fact question.  Until then, Jost will be permitted to opine on whether industry standards and customs support Defendants' interpretation of Section 2's ambiguous terms.

What remains in Plaintiffs' motion challenging Jost are various arguments pertaining to whether her opinions are supported and consistent with language in the SOAs and their competing interpretation of the relevant parol evidence.  The Court concludes, however, that such evidence bears on the weight of such evidence, not its admissibility.  *Hertz v. Luzenac Am., Inc.*, 2011 WL 1480523, at *4 (D. Colo. 2011) ("[A]ny issue of credibility or weight of the expert's testimony belongs to the trier of fact.").  Allowing vigorous cross examination of, but not excluding, such testimony is the appropriate approach for the Court to take.

In sum, the Court will not altogether exclude Jost's opinions regarding the ambiguous provisions of Section 2, but it will exclude those opinions that amount to contract interpretation.

## IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part

Plaintiffs' motion to exclude expert testimony from Jamie Jost.  (ECF No. 195.)


Dated this 27th day of August, 2024.

BY THE COURT:

William J. Martínez
Senior United States District Judge