IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 20-cv-2352-WJM-JPO

BOX ELDER KIDS, LLC,
C C OPEN A, LLC, and
GUEST FAMILY TRUST, by its Trustee CONSTANCE F. GUEST, individually and on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

ANADARKO E & P ONSHORE, LLC,
ANADARKO LAND CORPORATION, and
KERR-MCGEE OIL AND GAS ONSHORE, LP,

    Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO EXCLUDE EXPERT WITNESS TESTIMONY FROM PHILIP GOIRAN AND THOMAS ANDREWS

In this oil and gas dispute, Defendants Anadarko E & P Onshore, LLC, Anadarko Land Corporation, and Kerr-McGee Oil and Gas Onshore, LP ("KMOG") (collectively, "Defendants") move to exclude testimony from expert witnesses Philip Goiran and Thomas Andrews, proffered by Plaintiffs Box Elder Kids, LLC, C C Guest A, LLC, and the Guest Family Trust, by its Trustee Constance F. Guest, individually and on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"). (ECF Nos. 198, 199.) These motions are fully briefed. (*See also* ECF Nos. 204, 205, 210, 211.)

For the following reasons, the Court grants in part and denies in part both motions.

## I. PERTINENT BACKGROUND

The Court incorporates here the pertinent background of this case laid out in its Order granting in part and denying in part Plaintiffs' motion to exclude expert testimony from Jamie Jost.  (See ECF No. 227.)

As discussed in that Order, at bottom, this breach of contract dispute centers around the meaning of ambiguous terms in Section 2 of the parties' SOAs.  The Court now considers Defendants' motions to exclude certain opinions from Plaintiffs' expert witness, Philip Goiran, and all testimony from and the report of Plaintiffs' expert witness, Thomas Andrews.  (ECF No. 195.)

## II. LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert testimony.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).  Admission of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

To qualify as an expert, the witness must possess such "knowledge, skill, experience, training, or education" in the particular field as to make it appear that his or

2

her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004). To establish that the proffered testimony is reliable, the reasoning or methodology underlying the testimony must be valid and must be properly applied to the facts in issue. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–94 (1993) (listing four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance).

Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system . . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.*

### III. ANALYSIS

**A.    Philip Goiran**

Defendants move to preclude Plaintiffs' expert witness, Philip Goiran, a real estate attorney, from testifying as to the royalty payment history between the parties. (ECF No. 198 at 3.) Specifically, they move to exclude the following opinions:

- Anadarko never pays 2.5% on any well, notwithstanding the fact that the well is located on Plaintiffs' property. In other words, Plaintiffs take 100% of the burden of the well for which 2.5% of the value of oil and gas was promised, but Plaintiffs do not realize 2.5%.

3

- Landowners' expectations regarding compensation under a Surface Ownership Agreement ("SOA") had been consistent with Anadarko's and its predecessors' pay practices for 80+ years until 2010 when Anadarko began to proportionately reduce the 2.5%.
- Anadarko and its predecessor paid consistently with the well-spot method until 2010.

(*Id.*)  In Defendants view, Goiran cannot provide such testimony because he admitted during his deposition that he had no personal knowledge about the parties' payment history, and thus, his opinions on this topic are not based on reliable data.  *See* Fed. R. Evid. 702 (requiring expert testimony to be "based on sufficient facts or data").  (ECF No. 198 at 5.)

The Court agrees that Goiran may not testify on topics with which he has no familiarity or basis for offering expert opinion, including the parties' payment history, which Goiran admitted during his deposition that he did not know about "as a factual matter."  (*Id.* at 4.)  Indeed, Goiran's expert report does not contain or reference information about the payment data between the parties, and he confirmed during his deposition that there are no "categories of information that [he] looked at that are not listed at the end of [his] report on the documents that [he] considered."  (*Id.* at 3.)

Notably, Plaintiffs barely dispute[1] that Goiran has no personal knowledge about

---

[1] Plaintiffs say that, contrary to Defendants' argument, Goiran did not disclaim knowledge about how Anadarko paid before 2010 but that he instead admitted he did not know whether Anadarko made any *allocated payments* before 2010.  (ECF No. 205 at 6.)  But Goiran also effectively admitted that he did not know anything about the parties' payment history when he conceded that he did not review any information "that [is] not listed at the end of [his] report." (ECF No. 198 at 3.)  And, as mentioned, his report did not include information about or reference the parties' payment history.  (*Id.*)  Thus, in the Court's view, it is fair to say that

the payment history between the parties. (*See generally* ECF No. 205.) Nonetheless, they suggest that this does not matter because the payment history between the parties is undisputed. (*Id.* at 4.) But the Court is unaware of any authority—and Plaintiffs point to none—holding that an expert can testify about matters on which they have no personal knowledge so long as those matters are undisputed by the parties.

Thus, the Court will prohibit Goiran from testifying about the payment history between the parties. *See United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008) ("[T]he proponent of the opinion must show that the witness gathered sufficient facts and data to formulate the opinion."); *Workman v. Kretzer*, 548 F. Supp. 990, 997 (D. Kan. 2022) (excluding testimony where expert "had no knowledge" of various hypotheticals sought be introduced by defendant, making his "opinions fatally unreliable"); *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536–37 (7th Cir. 2000) (affirming a district court that excluded expert testimony where the expert failed to prepare design drawings and failed to do anything else that would have rendered his opinion reliable under *Daubert*); *Daubert*, 509 U.S. at 590 ("Admissible testimony must be supported by good grounds, based on what is known.") (internal quotation marks omitted); *cf. Paugh v. Uintah County*, 2020 WL 4597062, at *15 (D. Utah 2020) (finding that an expert's testimony is reliable where he had "personal knowledge of the facts because he attested to reviewing the voluminous record in this case").

Defendants also move to exclude Goiran's proffered testimony that landowners, as a general group, "have an expectation when the surface of their land is used for oil and gas production, such as the drilling and producing of a well, that they will be paid

---

Goiran admitted he did not know about the parties' payment history.

5

the entire 2.5% of the production from that well." (ECF No. 198 at 7.) Defendants argue that such testimony is "not the product of knowledge, skill, experience, or education within the meaning of Fed. R. Evid. 702," and later, in their reply, they argue that such testimony is not relevant or reliable. (*Id.*; ECF No. 211 at 4.)

As Plaintiffs point out, however, Goiran bases his opinion about general landowner expectations on his decades-long experience representing clients "who owned land subject to surface owner agreements" and that were involved in "conflicts with oil and gas companies related to surface use, primarily." (ECF No. 205 at 9.) Moreover, Goiran has reviewed the two SOAs at issue in this case. (*Id.*) In the Court's view, this experience qualifies him to testify "regarding what a typical landowner's expectations have been in terms of payment under the terms of SOAs similar and identical to those at issue here." (*Id.* at 10.) To the extent Defendants argue that Goiran's opinions are "at odds with how mineral lessees pay oil and gas royalties pursuant to oil and gas leases," (ECF No. 198 at 9), they are free to address this perceived inadequacy through cross-examination. *See Lovato v. Burlington N. & Santa Fe Ry. Co.*, 2002 WL 1424599, at *4 (D. Colo. 2002) ("Whatever shortcomings [the defendant] may perceive in [the expert's] academic or professional background are more properly addressed in cross-examination.").

As to relevance and reliability, while somewhat of a close question, the Court concludes the testimony at issue clears the low bar set forth by Rule 401. *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006) (evidence is relevant if "it has any tendency to make a fact of consequence more or less probable than it would be without the evidence . . . Rule 401 is a liberal standard."); *Bethel v. Berkshire Hathaway*

6

*Homestate Ins. Co.*, 596 F. Supp. 3d 1260, 1265 (D. Colo. 2022) ("Second, if the expert is sufficiently qualified, the Court must determine whether the proposed testimony is sufficiently relevant to the task at hand, such that it logically advances a material aspect of the case.") (citation omitted).  On the one hand, the logical connection between a theoretical landowner's expectations when signing an SOA and the expectations the specific landowners in this case had when they signed these specific SOAs seems somewhat attenuated.  On the other hand, the Court is also mindful of its instruction that industry standards and customs evidence may be introduced at trial to support Defendants' interpretation of Section 2's ambiguous terms.  *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005) (considering "competent evidence bearing on the construction given to the instrument by the parties themselves, by their acts and conduct in its performance").  In other words, since the Court has found that customs in the oil and gas industry are relevant to discerning the meaning of Section 2 of the SOAs, how other landowners as a general group would interpret similar SOAs to those at issue here may have some conceivable relevance.  As a result, the Court declines to exclude Goiran's proffered testimony on this topic on relevancy grounds at this juncture.[2]

In sum, Goiran may testify about landowner expectations generally, but he may not testify about topics with which he has little to no familiarity, including the payment

---

[2] To the extent Defendants disagree with Goiran about the original contracting parties' expectations in this case, they are free to challenge his opinions on cross-examination.  (*See* ECF No. 198 at 8 ("Had [Goiran] asked, he would have learned that Plaintiffs position is that 'this contract was written in 1989 when the folks structuring the contract were not anticipating situations such as this [horizontal wells]' and that they 'do not know what the actual intent was.'").)

history between the parties in this case.

**B.     Thomas Andrews**

Defendants "move to exclude in their entirety the opinions and report of Plaintiffs' expert Thomas G. Andrews," an environmental history professor. (ECF No. 199 at 1.) They challenge the first 15 pages of Andrews's 17-page report on relevancy grounds and the remaining two pages of his report on the grounds that it contains "unfounded speculation as to the motivations of the" original contracting parties and "improperly usurps the role of the jury." (*Id.* at 2.) The Court grants in part and denies in part Defendants' motion.

In an effort to discern the meaning of Section 2's ambiguous terms, Plaintiffs hired Andrews to prepare a report "to provide historical context to the circumstances surrounding the creation of the land grant lands and the development of the mineral estates, including the purpose of the SOAs." (*Id.* at 4.) Andrews's report is divided into four parts, grouped by the following headings: (1) "Origins and Development of Congressional Land Grant to Transcontinental Railroads"; (2) "The Denver Pacific Railway and the DP Land Grant"; (3) "Land Sales and Mineral Reservations"; and (4) "Surface Owner Agreements: Motivations for Continuity, Departures from Tradition." (*Id.* at 3–4.)

In parts 1 and 2, Andrews discusses at long-length the legislative history and lobbying efforts that led to the passage of the Pacific Railway Acts of the 1860s, which ultimately resulted in a congressional land grant to Union Pacific Railroad Company and other railroads for construction of the transcontinental railroad. (*Id.* at 15–26.) In part 3, Andrews describes how title became settled for land grants and how Plaintiffs' surface lands were sold to their predecessors-in-interest. (*Id.* at 26–30.)

8

Defendants argue that parts 1–3 are not relevant to the disputed issue in this case: the intent of the parties at the time they signed the SOAs. (*Id.* at 7 ("[Andrews's] history lesson sheds no light on what Anadarko's predecessor, the Shaklees, or the Guests intended Section 2 to mean at the time their SOAs were signed in 1973 and 1989.").) As for part 4, Defendants argue that Andrews simply "summarizes what he learned about SOAs from reviewing Plaintiffs' favorite documents produced in discovery, many of which are themselves irrelevant to the dispute. These are not appropriate expert opinions and must be excluded because they are unhelpful to the jury[.]" (*Id.* at 8.)

Starting with part 4, the Court disagrees with Defendants that Andrews's report and related testimony is irrelevant. Andrews's testimony about the history of SOAs generally and why the original parties entered them is related to Plaintiffs' theory that the parties contracted to maintain good working relationships to avoid future litigation. (*See id.* at 30 ("[Union Pacific] and its descendants prized 'friendly,' 'good,' and 'harmonious' relations with surface owners because company officials worried that conflicts with surface owners could lead to adverse legal and financial outcomes.").) His proffered testimony in part 4 also supports Plaintiffs' theory that the original parties drafted the SOAs pursuant to the "well-spot method" in part because Defendants' predecessors-in-interest "recognized that oil and gas production often had adverse effects on surface owners; the companies worried that such effects, in turn, might prompt surface owners into seeking remedies through the courts." (*Id.* at 31.)

Andrews also opines that, "[b]etween the late 1990s and the early 2010s, though, UP Resources and Anadarko moved away from the companies' long-running policies.

9

First, [Union Pacific Railroad] no longer obligated producers to secure SOAs before drilling could begin.  Second, Anadarko informed surface owners that it would no longer adhere to its past policy of paying them 2.5% of net production for wellheads located on their properties." (*Id.*)  In the Court's view, this testimony is relevant because it tends to explain why the original contracting parties agreed to enter the SOAs.  *Leonard*, 439 F.3d at 651; *E. Ridge of Fort Collins, LLC*, 109 P.3d at 974 (extrinsic evidence of the "circumstances of the transaction" and the "purpose and impact of the agreement on the parties" are appropriate to consider in discerning the meaning of ambiguous contract provisions).

Nor does the Court conclude that part 4 of Andrews's report usurps the role of the jury in determining what Section 2's ambiguous terms mean.  Far from inappropriately interpreting the legal meaning of the ambiguous terms of the contract, part 4 simply purports to provide historical context as to why the SOAs were drafted in the way that they were.  Hence, contrary to Defendants' assertion, the proffered evidence does not simply regurgitate record evidence or "speculate as to the motives and intentions of the actors in those documents."  *Cf. United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1252 (D.N.M. 2015) ("When the expert opines on the basis of 'expertise' rooted in the facts of the case being tried, [the expert] is effectively arguing the case as a mouthpiece for counsel."). (*Id.* at 9.)  For these reasons, with one exception,[3] the Court denies Defendants' challenge to part 4 of Andrews's report and his related testimony.

---

[3] Pursuant to the parties' agreement, the Court excludes any testimony from Andrews pertaining to "Anadarko's 2015 10k filing with the SEC."  (ECF No. 204 at 8.)

That said, the Court agrees with Defendants that much—if not the vast majority—of parts 1–3 of Andrews's report and related testimony is not relevant and will be excluded at trial. For example, Andrews's testimony about the events predating the parties' contract by a century, including, as Defendants put it, "horse-trading and back-room dealing involved in passage of the Pacific Railway Acts of the 1860s; detailed accounts of politicians physically assaulting one another; stories of corruption by executives of the railroad companies during construction of the transcontinental railroad; the government's issuance of title patents for lands to the railroad companies; and the familial and employment histories of the predecessors-in-interest to Plaintiffs' surface lands," will not be permitted. (ECF No. 199 at 7.) Instead, the Court will require Plaintiffs to tailor those portions of parts 1–3 of Andrews's report such that the testimony directly and concisely provides context and foundation for Andrews's opinions set forth in part 4 of his report.

## IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants' motions to exclude expert testimony from Philip Goiran and Andrew Thomas. (ECF Nos. 198, 199.)

Dated this 29th day of August, 2024.

BY THE COURT:

William J. Martinez
Senior United States District Judge